# EXHIBIT R

1              UNITED STATES DISTRICT COURT

2            FOR THE WESTERN DISTRICT OF MICHIGAN

3                    SOUTHERN DIVISION

4    ANTHONY A. MACHOLTZ, an individual,

5              Plaintiff,

6         -vs-                  Case No. 1:19-CV-173

7    CARRINGTON MORTGAGE SERVICES, LLC, a Delaware

8    limited liability company; and WILMINGTON SAVINGS

9    FUND SOCIETY, FSB, as Trustee of Standwich Mortgage

10   Loan Trust, a Delaware corporation,

11             Defendants.

12   _____

13   The deposition of DARYL DEWHURST was taken by the

14   Plaintiff on Friday, March 13, 2020, at 28400

15   Northwestern Highway, 2nd Floor, Southfield, Michigan,

16   at 10:16 a.m.

17   _____

18

19

20

21

22   Job #613528

23

24   Reported by:  Cindy A. Boedy, CSR 4696

25                 Certified Stenographic Reporter

Page 2

```
1    APPEARANCES:
2    WESTBROOK LAW, PLLC
3    Theodore J. Westbrook
4    6140 28th Street SE
5    Suite 115
6    Grand Rapids, Michigan  49546
7    twestbrook@westbrook-law.net
8    616.888.6111
9    Appearing on behalf of the Plaintiff.
10
11   MADDIN HAUSER ROTH & HELLER, PC
12   Deborah Lapin
13   28400 Northwestern Highway
14   2nd Floor
15   Southfield, Michigan  48034-8348
16   248.208.0709
17   dlapin@maddinhauser.com
18   Appearing on behalf of the Defendants.
19
20
21
22
23
24
25
```

Page 3

```
1
2                    TABLE  OF  CONTENTS
3
4    WITNESS                                        PAGE
5    DARYL DEWHURST
6    Examination by Mr. Westbrook                     5
7
8
9
10   EXHIBITS (Attached)
11   Exhibit 1    notice of deposition              11
12   Exhibit 2    mortgage                          13
13   Exhibit 3    compromise settlement             27
14                and release agreement
15   Exhibit 4    judgment of divorce               31
16   Exhibit 5    loan modification agreement       35
17   Exhibit 6    case caption                      42
18                Macholtz versus CitiMortgage, Inc.
19   Exhibit 7    two documents                     45
20   Exhibit 8    computer printout                 52
21   Exhibit 9    documents                         69
22   Exhibit 10   notice of sale and                79
23                pending foreclosure
24
25                (Exhibits continued - page 4)
```

Page 4

```
1    EXHIBITS (continued)
2    Exhibit 11   publication notices               83
3    Exhibit 12   6/15/18 letter                    87
4    Exhibit 13   7/25/18 letter                    94
5    Exhibit 14   4/24/18 letter                   105
6    Exhibit 15   10/8/18 letter                   110
7    Exhibit 16   fax cover sheet                  119
8    Exhibit 17   defendants' supplemental         121
9                 responses to plaintiff's
10                request for admission
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

Page 5

```
1                 Southfield, Michigan
2                 Friday, March 13, 2020
3                    10:16 a.m.
4
5                      -  -  -
6
7              COURT REPORTER:  Do you swear the
8    testimony you're about to give will be the truth,
9    the whole truth, and nothing but the truth?
10             THE WITNESS:  I do.
11             D A R Y L   D E W H U R S T ,
12   after having been first duly sworn to tell the
13   truth, the whole truth, and nothing but the
14   truth, was examined and testified follows:
15                    EXAMINATION
16   BY MR. WESTBROOK:
17   Q.   Good morning, Mr. Dewhurst.
18   A.   Good morning.
19   Q.   I'm saying that correctly, aren't I?
20   A.   Yes.
21   Q.   Thanks for being here.  I know under the
22        circumstances it isn't the easiest trip to make.
23   A.   Right.  My pleasure.
24   Q.   So you're employed by Carrington Mortgage
25        Services; is that correct?
```

Page 6

1  A.  Correct.
2          MS. LAPIN:  Ted, can I just put a quick
3      objection?  I just want to indicate that I had
4      issued those objections to the dep notice, and so
5      I'm just repeating and incorporating them herein,
6      and that's it.
7          MR. WESTBROOK:  That's fine.  I
8      received those objections.
9          MS. LAPIN:  Thanks.
10  BY MR. WESTBROOK:
11  Q.  What is your job title?
12  A.  Case manager.
13  Q.  What does the job title case manager entail?
14      What are your ordinary responsibilities?
15  A.  Basically I review contracts, business records
16      and procedures, and attend court trials,
17      settlements, mediations, depositions such as
18      this.
19  Q.  I assume you've had your deposition taken before?
20  A.  No.
21  Q.  This is your first one?
22  A.  It is.
23  Q.  Well, I should go over the general parameters
24      then.
25          I'm sure you're familiar with the

Page 7

1      question and answer format of a deposition,
2      correct?
3  A.  Sure.
4  Q.  You've had a chance to meet with your counsel
5      about what a deposition involves?
6          One of the ground rules that I'm going
7      to probably have to get on your case about from
8      time to time, and don't take it personally, is
9      waiting until I'm done asking a question before
10      you start your answer.  If we're talking at the
11      same time, it's really difficult for the court
12      reporter to get down everything, and having to
13      look at a transcript afterwards and determine
14      whether an answer was to the question being asked
15      or not is difficult if more than one person is
16      talking at a time.
17          So a real ordinary conversational thing
18      that we do is anticipate where the question is
19      going and answer before the speaker is done.
20      I'll ask that you try not to do that.  If you do,
21      I'll just issue gentle reminders, and we'll go on
22      our way, okay?
23  A.  That's fine.
24  Q.  If there's a question that you don't understand,
25      that's unclear to you, I'd ask that you point

Page 8

1      that out to me and ask me to clarify.  Is that
2      fair?
3  A.  Yes.
4  Q.  Otherwise, I'll assume that you've understood the
5      question, okay?
6  A.  Yes.
7  Q.  Have you ever testified at a trial before?
8  A.  Yes.
9  Q.  How many trials have you testified at?
10  A.  It's impossible to put a number.  Many trials.
11  Q.  More than ten?
12  A.  Yes.
13  Q.  Have you testified at a trial in the state of
14      Michigan before?
15  A.  No.
16  Q.  Do you have a particular territory or do you go
17      all around the country?
18  A.  Essentially, all around the country.  I can't say
19      that I've been to every state, but I've been to a
20      lot of them.
21  Q.  Fair enough.
22          Do you have a direct supervisor at
23      Carrington?
24  A.  Yes.
25  Q.  I may refer to Carrington as CMS.  You'll know

Page 9

1      what I mean if I say CMS, right?
2  A.  Yes.
3  Q.  Who is your direct supervisor at CMS?
4  A.  Clayton Gordon.
5  Q.  What is Mr. Gordon's title?
6  A.  Things have changed recently at CMS, Carrington.
7      I think his title might be mediation manager.
8  Q.  Do you know how many direct reports he has?
9  A.  No.
10  Q.  Is it fair to say that as part of your job
11      duties, you've been assigned to monitor
12      litigation and act as a liaison between CMS and
13      its outside counsel?
14          MS. LAPIN:  I'm just going to object to
15      the form of the question.  You can answer.
16          THE WITNESS:  Yes.
17  BY MR. WESTBROOK:
18  Q.  Have you been assigned to be a representative of
19      CMS in connection with this case that we're here
20      for?
21  A.  Yes.
22  Q.  What does that assignment involve?
23  A.  I reviewed many documents in relation to the
24      notice of deposition provided in anticipation of
25      today's deposition.

Page 10

1  Q.  When did you receive that assignment to be CMS's
2      representative in this case?
3  A.  I would say -- I don't know the exact date, but
4      it would be probably three or four weeks ago.
5  Q.  Did you have any involvement in CMS's efforts to
6      produce documents in this case?
7  A.  No.
8  Q.  Do you know who did?
9  A.  No.
10 Q.  Do you have an understanding of what this case
11     Macholtz versus Carrington Mortgage Services is
12     about?
13 A.  Yes.
14 Q.  What's your understanding?
15 A.  My understanding loosely is that the property
16     went to foreclosure and the borrower is
17     contesting that.
18 Q.  You said you reviewed some documents after you
19     received the assignment to be Carrington's
20     representative here, right?
21 A.  Yes.
22 Q.  How many documents did you review?
23 A.  There was a lot.  There was literally hundreds of
24     pages of documents.
25 Q.  How were they provided to you?  In what form?

Page 11

1  A.  They were provided electronically and also in
2      physical form.
3  Q.  Were they provided to you by CMS's counsel or
4      someone else?
5  A.  They were provided by CMS counsel.
6  Q.  Inside counsel or outside counsel that's here
7      with you today?
8  A.  Counsel that's here with me today.
9  Q.  Did you review any documents that were not
10     provided by your counsel that's here with you
11     today in preparation for today?
12 A.  I did receive some documents internally within
13     CMS.  I cannot remember which of those documents
14     they were, but I did receive some documents
15     internally.
16 Q.  All right.  Do you know if all the documents that
17     you reviewed to prepare for today's deposition
18     have been produced in this litigation?
19 A.  As far as I'm aware.
20 Q.  As far as you're aware, they were?
21 A.  Yes.
22          (Exhibit 1 marked.)
23 BY MR. WESTBROOK:
24 Q.  I'm going to hand you a document I just marked as
25     Exhibit 1.  This document is entitled, "Notice of

Page 12

1      Rule 30(b)(6) Deposition of Carrington Mortgage
2      Services, LLC."  Do you see that title there on
3      the first page?
4  A.  Yes.
5  Q.  I'll represent to you that this is the notice
6      that is the reason why we're here today.  Is this
7      a document you reviewed before?
8  A.  Yes.
9  Q.  And are you prepared to testify as to CMS's
10     knowledge regarding the noticed topics?
11 A.  Yes.
12 Q.  What did you do to prepare to testify apart from
13     reviewing the documents as we just talked about?
14 A.  Again, I reviewed the documents as previously
15     described and consulted with counsel who is
16     present today.
17 Q.  Did you meet with any other CMS employees to
18     prepare to provide testimony today?
19 A.  I did speak with Clayton Gordon.  Actually
20     physically meeting with someone, no.
21 Q.  What did you speak with Mr. Gordon about?
22 A.  Just loosely preparation for depositions as this
23     is my first deposition.
24 Q.  Understandable.
25 A.  Yes.

Page 13

1  Q.  Mr. Gordon has some experience, some guidance to
2      impart about depositions generally?
3  A.  Yes.
4  Q.  Anything specific to this particular case?
5  A.  Not that I recall, no.
6  Q.  You can put Exhibit 1 aside for the moment.
7          Do you recall if the documents that you
8      reviewed in preparation for today included a note
9      and mortgage from Anthony and Dena Macholtz
10     around the 2005 time frame?
11 A.  Yes.  From memory, the documents did contain
12     those.
13 Q.  From reviewing those documents, you understand
14     CMS wasn't the original servicer of the loan,
15     correct?
16 A.  That's correct.
17 Q.  Do you recall who the original servicer was?
18 A.  No.
19          MR. WESTBROOK:  I'm not going to make
20     this a memory test.  I've got documents to show
21     you that I think will help refresh your memory.
22          (Exhibit 2 marked.)
23 BY MR. WESTBROOK:
24 Q.  I'll hand you what we've marked Exhibit 2.
25     Exhibit 2 is entitled, "Mortgage."  You see that

Page 14

1    title at the top of the first page there?
2  A.  Yes, I do.
3  Q.  I'll ask you to ignore the header there, which is
4      part of the court filing header that's on each
5      page, because that wasn't part of the original
6      document.  But apart from that, we have thirteen
7      pages and on the last page we have signatures by
8      Anthony A. Macholtz and Dena G. Macholtz.  Do you
9      see that?
10 A.  Yes, I do.
11 Q.  Appears looking at the first page that the
12     mortgage is in favor of MERS, Mortgage Electronic
13     Registration Systems, Inc., as nominee of lender
14     Home Loan USA Corporation.  Do you see that on
15     the first page?
16 A.  Yes, I do.
17 Q.  As far as you can tell, is this the mortgage
18     that's at issue in this case?
19 A.  As far as I can tell, yes.
20 Q.  I understand you wouldn't have memorized every
21     word of the document.
22 A.  No.
23 Q.  That would be unreasonable for me to assume that
24     you had, but you don't have any reason to believe
25     that there's some other mortgage at issue in this

Page 15

1      case, right?
2  A.  No.
3  Q.  Do you know generally when CMS became the
4      servicer of the loan that's connected with this
5      mortgage?
6  A.  I can't recall off the top of my head.
7  Q.  If I told you information I received reflects
8      that CMS started servicing loans sometime around
9      January of 2017, would that be consistent with
10     your memory?
11 A.  Yes.  That jogs my memory, yes.
12 Q.  Also, would it be consistent with your memory
13     that the predecessor servicer to CMS was
14     CitiMortgage?
15 A.  Yes.
16 Q.  Now, did CMS receive information from
17     CitiMortgage when CMS became the servicer?
18 A.  Yes.
19 Q.  Is there a standard set of information CMS
20     typically receives from a predecessor servicer
21     when CMS becomes the new servicer?
22 A.  We would receive the service and history
23     documents in relation to the loan being
24     transferred.
25 Q.  How is that information transmitted to CMS from

Page 16

1      the predecessor?
2  A.  That would --
3          MS. LAPIN:  In general or this
4      particular one?
5          MR. WESTBROOK:  I suppose I'll start
6      with in general.
7          THE WITNESS:  Generally, we would
8      receive notification of a transfer of loans and
9      we would receive the loan file if it was part of
10     a series of loans.  We'd go through a series of
11     checks and balances to make sure the information
12     is correct from the transmitted party to CMS.
13         If at any time there's a discrepancy in
14     the information, we would reject the file and we
15     would also have a series of conference calls and
16     e-mails with the transferring organization to
17     verify that the information is correct and iron
18     out any problems.
19 BY MR. WESTBROOK:
20 Q.  So would the information -- with respect to this
21     particular file coming from CitiMortgage to CMS,
22     information that came over from CitiMortgage,
23     would that have included the principal amount of
24     the loan?
25 A.  Yes.

Page 17

1  Q.  The amount past due?
2  A.  Yes.
3  Q.  The escrow shortage amount, if there was any?
4  A.  Yes.
5  Q.  The periodic payment amount?
6  A.  Correct.
7  Q.  The interest rate?
8  A.  Yes.
9  Q.  And I suppose the term of the loan, the length?
10 A.  Yes.
11 Q.  I think you may have covered this, but I want to
12     make sure I'm clear on it.  Apart from the
13     history, the account history for the loan that
14     would show payments and disbursements and things
15     like that, other documents would have come to CMS
16     from CitiMortgage also, right?
17 A.  Correct.
18 Q.  The note and mortgage, for example, would those
19     come over from CMS -- or from CitiMortgage, I
20     apologize?
21 A.  Sorry.  Yes.
22 Q.  The history of account statements?
23 A.  Yes.
24 Q.  By the way, do they come over -- did they come
25     over from CitiMortgage to CMS in electronic form

Page 18

1    or paper?
2  A.  I believe they would have come across in both
3      formats to the best of my knowledge.
4  Q.  What about communications, like letters, from
5      CitiMortgage to the borrowers, would these have
6      come over from CitiMortgage to CMS on this file?
7  A.  Again, to the best of my knowledge, yes.
8  Q.  Would any court orders involving the loan have
9      come over from CitiMortgage to CMS?
10 A.  To the best of my knowledge.
11 Q.  Do you know if a document like a judgment of
12     divorce with a property settlement came over from
13     CitiMortgage to CMS?
14 A.  Possibly.  I can't recall seeing it myself, but
15     possibly.
16 Q.  Would that be something you'd typically expect to
17     find in a file from a predecessor servicer if
18     there has been a judgment of divorce with a
19     property settlement involving the loan?
20 A.  If there was one provided to the prior servicer,
21     then it could reasonably be expected to be
22     provided.
23 Q.  Understood.
24         Other court orders involving loan could
25     include litigation judgments; is that fair?

Page 19

1  A.  Yes, to the best of my knowledge.
2  Q.  Do you know if any litigation judgments came
3      through from CitiMortgage to CMS on this
4      particular Macholtz loan file?
5  A.  I'm unsure.
6  Q.  Do you know if any bankruptcy court orders came
7      through from CitiMortgage to CMS on the Macholtz
8      loan file?
9  A.  I'm unsure.
10 Q.  You alluded to this just a minute ago.  I want to
11     get into it.  There's a procedure at CMS for
12     reviewing information that comes to CMS from a
13     predecessor servicer like CitiMortgage, right?
14 A.  Correct.
15 Q.  And I think you testified that that procedure
16     involves reviewing what comes through in the file
17     to see that the history and servicing industry is
18     accurate.  Is that fair?
19 A.  Yes.
20 Q.  Who does that review at CMS?
21 A.  That would be individuals within our collateral
22     department.
23 Q.  Does a review like that take place with respect
24     to every loan that CMS receives servicing rights
25     to from the predecessor?

Page 20

1  A.  To the best of my knowledge, yes.
2  Q.  The standard practice is to do that type of
3      review, right?
4  A.  To the best of my knowledge.
5  Q.  Do you know what information -- as a matter of
6      policy or procedure, do you know what information
7      is reviewed by CMS?
8          MS. LAPIN:  I'm just going to object to
9      the form and just to the extent that you're
10     delving into procedure or policy that could be
11     deemed proprietary.  That's all.
12         You can still answer.  Unless I direct
13     you not to answer, you've got to answer.
14         THE WITNESS:  Would you mind repeating
15     the question, please?
16 BY MR. WESTBROOK:
17 Q.  I'm interested to know as a matter of standard
18     procedure what information CMS reviews when a
19     loan file comes in from a predecessor servicer.
20 A.  To my knowledge, they would review financial
21     information, the balances, interest rates, escrow
22     amounts, et cetera.  And, again, to my knowledge,
23     they would review documents from the document
24     file.
25 Q.  The goal of this review is to ensure that CMS has

Page 21

1      the essential loan information correct so that it
2      can do its job as servicer, correct?
3          MS. LAPIN:  Objection to form.
4          THE WITNESS:  Yes.
5  BY MR. WESTBROOK:
6  Q.  Is there any document or documents or compilation
7      of information or report that's created as a
8      result of the loan file review that we just
9      discussed?
10         MS. LAPIN:  Same objection in terms of
11     policy, procedure, proprietary information, but
12     go ahead.
13         And also I would also -- form, just
14     general procedure as opposed to this particular
15     case, but you can definitely still answer.
16         THE WITNESS:  I'm unsure.
17 BY MR. WESTBROOK:
18 Q.  Do you know if any report of a loan review by CMS
19     of the file that came from CitiMortgage in this
20     instance was created?
21         MS. LAPIN:  Same objection.
22         THE WITNESS:  I haven't seen the
23     report, but I'm sure that it would have been some
24     kind of a checks and balance report.
25 BY MR. WESTBROOK:

1  Q.  Do you know if that's a document that would be
2      included in CMS's electronic systems?
3  A.  I'm sure it would be, yes.
4  Q.  Do you know what the title of that report would
5      be?
6  A.  No, I don't.
7  Q.  Is it fair to say that once CMS completed its
8      loan review with respect to this Macholtz loan
9      file that CMS input information, servicing
10     information, into CMS's own servicing
11     information?
12 A.  Yes.
13 Q.  Information put into the servicing system would
14     have to include all those parameters we talked
15     about, right, the interest rate of the loan?
16 A.  Yes.
17 Q.  The principal balance, right?
18 A.  Yes.
19 Q.  The delinquency, if there is one, right?
20 A.  Right.
21          MS. LAPIN:  Just going to object to
22     form.
23 BY MR. WESTBROOK:
24 Q.  Do you know if with respect to this loan file
25     that's at issue in this case if CMS took into

1      account any court orders when it input
2      information regarding the Macholtz loan into its
3      system?
4  A.  I don't know.
5  Q.  If CMS determines that there's some kind of
6      discrepancy between the documents that show up in
7      a loan file it's receiving from a predecessor and
8      the loan history that's come from the
9      predecessor, what is done by CMS in that
10     instance?
11          MS. LAPIN:  Just my same general
12     objection regarding policy, procedure, to the
13     extent it constitutes proprietary info, but
14     definitely still answer.
15          THE WITNESS:  To my knowledge, any
16     discrepancy would be brought up between CMS and
17     whomever the prior servicer may be, and until the
18     discrepancy was addressed, the loan would not be
19     boarded into our system.
20 BY MR. WESTBROOK:
21 Q.  Do you know if any discrepancy was brought up by
22     CMS with CitiMortgage with respect to the loan
23     that's at issue in this case?
24 A.  I'm not aware of any discrepancy, but the loan
25     obviously was boarded into our system.

1  Q.  Are you aware of any modification of the Macholtz
2      loan that's at issue in this case that took place
3      in the year 2013?
4  A.  To the best of my knowledge, I'm aware of, I
5      believe, a trial payment plan that was entered
6      into.
7  Q.  If a loan modification agreement existed in a
8      file of a predecessor servicer that came over
9      from CMS or came over from CitiMortgage to CMS,
10     is that something that the CMS reviewer or
11     reviewers would take into account in determining
12     whether the loan file is all consistent with the
13     predecessor servicer's account history?
14          MS. LAPIN:  Just going to object to
15     form.  You can answer.
16          THE WITNESS:  Again, would you mind
17     repeating the question?  I didn't quite catch --
18          MR. WESTBROOK:  I may be able to
19     rephrase it better.
20          THE WITNESS:  Seemed like a lot of
21     questions in one question.
22          MS. LAPIN:  That's right.  That's all.
23     You're going to be able to answer the question.
24     Just let me make the objection.
25 BY MR. WESTBROOK:

1  Q.  What I'm after is in the situation in which a
2      modification agreement appears in the file that's
3      coming over from a predecessor servicer to CMS,
4      is that document something that the CMS reviewer
5      reviewing the account that's coming in for
6      servicing would take into account in determining
7      whether there is a discrepancy between the
8      information that's provided by the predecessor
9      and what shows up in the documents in its file?
10          MS. LAPIN:  Same objection as to form.
11     You can answer if you ...
12          THE WITNESS:  The agreement would be
13     reviewed by our collateral team.  Had the loan or
14     any loan been modified, then the terms of such
15     loan would be entered into our system to the best
16     of my knowledge.
17 BY MR. WESTBROOK:
18 Q.  All right.  That's fair.  Let me walk you through
19     more of a concrete hypothetical maybe.
20          Let's say a loan file comes in to CMS
21     from a predecessor like CitiMortgage and Citi
22     Mortgage's account history shows the loan hasn't
23     been modified, but then there's a modification
24     agreement that comes through in the documents
25     that seems to show that it has been modified.

Page 26

1      How would that scenario be treated by CMS?
2              MS. LAPIN:  Just going to object.
3      Form, foundation, calls for speculation.
4              THE WITNESS:  Again, to the best of my
5      knowledge, any documents that are provided would
6      be imaged into our system.
7              But it seems to be potentially the same
8      answer to the similar previous question that had
9      a loan actually been finally modified and terms
10     been established, then they would have been
11     entered into CMS's system at the onboarding
12     stage.
13 BY MR. WESTBROOK:
14 Q.   Notwithstanding that the predecessor servicer
15     appeared not to recognize that modification?
16 A.   That would appear correct.
17 Q.   You said you reviewed many documents prior to
18     today involving this loan file.  Were you aware
19     as a result of that review of a lawsuit regarding
20     this loan that was initiated back in 2011 by
21     Mr. Macholtz and his wife against CitiMortgage?
22 A.   Yes.
23 Q.   Do you know if CMS received information about
24     that lawsuit from CitiMortgage with the loan
25     file?

Page 27

1 A.   To the best of my knowledge, yes.
2 Q.   Do you know if CMS received information regarding
3      the settlement of that lawsuit?
4 A.   I don't recall.
5              (Exhibit 3 marked.)
6 BY MR. WESTBROOK:
7 Q.   I've just handed you what we've marked Exhibit 3.
8      At the top in bold underlined, it says,
9      "Compromise Settlement and Release Agreement."
10     Do you see that at the top of the first page
11     there?
12 A.   Yes, I do.
13 Q.   Looks like five pages, signature page on page 5,
14     with a signature under the title, "CitiMortgage,
15     Inc."  Do you see that?
16 A.   Yes, I do.
17 Q.   Is this a document that you've seen before?
18 A.   Yes.
19 Q.   Do you know if CMS's files that came over from
20     CitiMortgage regarding this loan contained this
21     document?
22 A.   I reviewed many documents and this does appear to
23     be one of them.  But, like I said, I reviewed
24     hundreds of pages of documents.
25 Q.   You don't know whether this was a document that

Page 28

1      would have come over form CitiMortgage to CMS as
2      part of the servicing transfer?
3 A.   It should have come across as part of the
4      servicing transfer.
5 Q.   Do you know if anyone received this document when
6      CMS became a servicer?
7 A.   To the best of my knowledge, it would have been
8      reviewed as part of the onboarding process.
9 Q.   Under the recitals portion, which is the second
10     paragraph on the first page, it refers to the
11     prior lawsuit that I mentioned.  It says,
12     "Whereas there is pending in the United States
13     District Court for the Western District of
14     Michigan, remove to federal court from the
15     Berrien County Circuit Court, an action entitled
16     'Anthony A. Macholtz versus CitiMortgage, Inc.,
17     Case No. 1:11-CV-01250-JTN.'"  Did I read that
18     correctly?
19 A.   Yes.
20 Q.   I'd like you to flip to the following page.
21     There is a section labeled, "To CMI's obligations
22     and representations."  Do you see that?
23 A.   Yes.
24 Q.   And I'll represent to you that CMI is initialism
25     for CitiMortgage, Incorporated.  With that

Page 29

1      assumption, under subsection A entitled "Loan
2      Modification," it says, "CMI has offered
3      plaintiff the loan modification agreement
4      attached hereto and incorporated herein as
5      Exhibit A.  Plaintiff shall execute and supply
6      all documents necessary to effectuate the loan
7      modification as detailed in the loan modification
8      agreement."  Do you see that?
9 A.   Yes, I do.
10 Q.   Fair to say this document seems to refer to a
11     loan modification that's to be entered into as
12     part of a settlement of the lawsuit, right?
13             MS. LAPIN:  I'll just object on the
14     grounds that the document speaks for itself.
15             THE WITNESS:  Yes, that's how it
16     appears.
17 BY MR. WESTBROOK:
18 Q.   You can tell looking at the first paragraph of
19     the first document who the parties to the
20     agreement are.
21 A.   The first paragraph, if you don't mind, I'll read
22     it just for verification.  "This compromised
23     settlement and release agreement, [agreement], is
24     entered into this 24th day of April, 2013.  The
25     effective date by and between Anthony A.

Page 30

1    Macholtz, hereinafter referred to as plaintiff,
2    and CitiMortgage, Inc., including its affiliates
3    and subsidiaries hereafter referred to as CMI,
4    plaintiff, and CMI sometimes collectively
5    referred to herein as the parties.  The parties
6    are executing this agreement with respect to the
7    following matters."
8    Q.   Yes, I agree that you've read that correctly.
9         Seems to indicate parties to this agreement are
10        Mr. Macholtz and CitiMortgage, Inc., right?
11   A.   Yes.
12   Q.   Dena Macholtz isn't mentioned in that paragraph,
13        right?
14   A.   That's correct.  She's not mentioned.
15   Q.   Are you aware of any communications -- I'm going
16        to leave aside the initial influx of information
17        from CitiMortgage to CMS regarding this loan,
18        that initial package.  Aside from that, have
19        there been discussions or communications between
20        CMS and CitiMortgage regarding this lawsuit
21        that's referenced in Exhibit 3?
22   A.   I'm trying to refresh my memory.
23             MS. LAPIN:  The question, discussions
24        between CMS and CMI?
25             MR. WESTBROOK:  Correct.

Page 31

1              MS. LAPIN:  That's the question?
2              MR. WESTBROOK:  Yes.
3              THE WITNESS:  To the best of my
4         knowledge, I'm not aware of any discussions.
5    BY MR. WESTBROOK:
6    Q.   Do you have a memory having reviewed many
7         documents of whether at the time that the
8         settlement is dated April 24 of 2013 whether
9         Anthony and Dena Macholtz were still married at
10        that time?
11   A.   I'm unaware.  I know that -- well, to the best of
12        my knowledge, they were going through or had gone
13        through a divorce, but I don't know the date of
14        the divorce.
15   Q.   Understood.
16             (Exhibit 4 marked.)
17   BY MR. WESTBROOK:
18   Q.   Handing you what's been marked as Exhibit 4.  At
19        the top of the page is a caption, "State of
20        Michigan Berrien County Trial Court Family
21        Division."  Just below that, the names Dena Gail
22        Macholtz, plaintiff, versus Anthony A. Macholtz,
23        defendant.  Do you see that?
24   A.   Yes.
25   Q.   And the title of the document says, "Judgment of

Page 32

1    Divorce."  Are you with me?
2    A.   Yes.
3    Q.   Do you know if CMS's files reflected a divorce
4         judgment in a case where Dena Macholtz and
5         Anthony Macholtz were parties?
6    A.   In my review of the document file, I cannot
7         remember coming across such a document.
8              MS. LAPIN:  I'll just state for the
9         record, we produced this.  This is our Bates
10        stamp.
11             Whether you recall reviewing it is,
12        obviously, is another story.
13             MR. WESTBROOK:  Right.  Maybe I'll just
14        clarify that too, because I think that's helpful.
15   BY MR. WESTBROOK:
16   Q.   The Bates stamp on the bottom right-hand corner
17        of the document on this first page is marked
18        CMS/WILM00087, right?
19   A.   Okay.
20   Q.   And is it your understanding that where documents
21        bear that Bates stamp prefix that they have come
22        from CMS's file?
23             MS. LAPIN:  I'm just going to state,
24        he's not going to, I think, necessarily know
25        that.

Page 33

1              MR. WESTBROOK:  He can tell me if he
2         doesn't know.
3              MS. LAPIN:  Yeah.
4              THE WITNESS:  I'm unaware.
5    BY MR. WESTBROOK:
6    Q.   Do you know of any other source for a document
7         that would show up with that Bates stamp other
8         than CMS's files?
9    A.   No.
10   Q.   I'm sorry, you said you don't recall reviewing
11        this document?
12   A.   That's correct.
13   Q.   Does that mean you may have, but you don't recall
14        it as we sit here today?
15   A.   Yes.
16   Q.   I'd like you to turn if you could to page 6 of 11
17        of the document that is Bates stamp 00092.  At
18        the very top of that page is a paragraph that's
19        numbered 6.01, real property.  Do you see that?
20   A.   Yes.
21   Q.   It says, "The defendant, Anthony A. Macholtz,
22        shall have and hold as its own separate state
23        that certain real property located at 1886
24        Russell Road, Baroda, Michigan, 49101," and then
25        there's a more lengthy property description.  Did

Page 34

1    I read that correctly?
2  A.  Yes.
3  Q.  Now, that 1886 Russell Road property in Baroda is
4      the same property that's reflected on the
5      mortgage that's at issue in this case, right?
6  A.  That's correct.
7  Q.  Underneath that paragraph that we just finished
8      talking about, it says, "Further, the defendant,
9      Anthony A. Macholtz, shall pay any and all
10     indebtedness owing with respect to said real
11     estate and shall hold the plaintiff, Dena Gail
12     Macholtz -- this is a typographical error -- but
13     Dena Gail Macholtz harmless from any and all such
14     debts."  Do you see that?
15 A.  Yes.
16 Q.  This would then appear to reflect that Dena
17     Macholtz was giving up the property, giving it to
18     Anthony Macholtz in the judgment of divorce,
19     right?
20         MS. LAPIN:  Objection.  Form,
21     foundation, the document speaks for itself.
22         THE WITNESS:  That's how it would
23     appear.
24 BY MR. WESTBROOK:
25 Q.  In the final paragraph of that section, it says,

Page 35

1    "The plaintiff shall execute and deliver to the
2    defendant coincident with the entry of this
3    judgment divorce a quitclaim deed for the above
4    described property."  Did I read that correctly?
5  A.  Yes.
6         MR. WESTBROOK:  You can set that aside
7      for now.
8         (Exhibit 5 marked.)
9  BY MR. WESTBROOK:
10 Q.  Handing you what I've just marked Exhibit 5.
11     I'll represent to you that it looks to me like
12     it's a couple of separate documents together, the
13     first top sheet being one document that has a big
14     Dykema logo in the upper-left corner, right?
15 A.  Yes.
16 Q.  And then following that is one or two, it's hard
17     to tell where there's a document split, documents
18     with a Citi logo, right?
19 A.  That's correct.
20 Q.  Have you had a chance to just flip through that
21     quickly?
22 A.  Just looking through it right now.
23 Q.  Okay.  Do you know if you had a chance to review
24     these documents prior to today's deposition?
25 A.  It appears to have been part of the documents

Page 36

1    that I reviewed.
2  Q.  All right.  Now, the first page that has the big
3      Dykema logo on it, it's addressed to Angela
4      Goggins, CitiMortgage, right?
5  A.  Yes.
6  Q.  Subject line, CitiMortgage v Macholtz.  Says,
7      "Dear Angela, Enclosed please find the original
8      signed modification per your request.  Please
9      contact me if you have any questions."
10     Sincerely, and then has a signature, Dykema
11     Gossett, by Mark J. Magyar.  Do you see that?
12 A.  Yes.
13 Q.  It appears to reference an enclosure and then on
14     the subsequently Bates numbered pages looks like
15     there's something in the form of an agreement,
16     right?
17         MS. LAPIN:  Objection.  Form,
18     foundation, documents speak for themselves.
19         THE WITNESS:  Yes.
20 BY MR. WESTBROOK:
21 Q.  Is it your understanding that CMS received this
22     document or these documents from CitiMortgage
23     when CMS began servicing the Macholtz loan?
24 A.  To the best of my knowledge.
25 Q.  Do you know if CMS ever compared the terms that

Page 37

1    are reflected in these documents to the servicing
2    information that CitiMortgage provided to CMS?
3  A.  I'm sure the document itself would have been
4      reviewed and had the mortgage actually -- sorry,
5      the modification taken place, it would have been
6      -- the terms would have been boarded into CMS's
7      system.
8  Q.  Is it your understanding that the terms of this
9      document were not boarded into CMS's system?
10 A.  To the best of my knowledge, they were not
11     boarded into our system.
12 Q.  Looking at the page that's Bates marked
13     CMS/WILM01721.  This appears to be addressed to
14     Anthony A. Macholtz at the top, right?
15 A.  Yes.
16 Q.  I'm going to walk through some of the terms that
17     are present in these documents.  The first one
18     that I'm interested in is there are several steps
19     that are listed on this page.  There's Step 4.
20     It says your new total monthly payment, in
21     parentheses, includes principal, interest, taxes,
22     and insurance, close paren, is $1,747.59 and is
23     due on 2/1/2013, right?
24 A.  Yes.
25 Q.  Then two pages later, the number is 1723, is

Page 38

1  either a section of that document or a new
2  document, that is entitled, "Loan Modification
3  Agreement." Do you see that?
4  A.  Yes.
5  Q.  It appears -- it says it is made -- this loan
6  modification agreement made this 26th day of
7  December, 2012, between Anthony A. Macholtz and
8  CitiMortgage, Inc., amends and supplements the
9  mortgage date of trust for security deed and
10 timely payment rewards rider, if any, dated
11 9/21/2005, right?
12 A.  Yes.
13 Q.  Under Section 1 underneath the section we were
14 just there at the top, the front matter, it says
15 the new principal balance as of 01/01/13, the
16 amount payable under the note and security
17 instrument, in parentheses, the new principal
18 balance is US $194,401.23, consisting of the
19 unpaid amount loan to borrower and lender, plus
20 any other interest and other amounts capitalized.
21 Do you see that?
22 A.  Yes.
23 Q.  Now, that new principal balance reflects a
24 different principal balance than what shows up in
25 CMS's systems as the principal balance on the

Page 39

1  loan, right?
2  A.  I'm unaware.
3  Q.  All right. We'll get into a comparison of it I
4  suppose later.
5      Just to clarify what you testified to a
6  moment ago, it's your understanding that someone
7  at CMS would have taken a look at this document
8  and compared it against the servicing information
9  that came in from CitiMortgage on this file?
10     MS. LAPIN: I'll object. Asked and
11 answered and form, but go ahead.
12     THE WITNESS: I mean, to the best of my
13 knowledge, the document would have been reviewed,
14 and had the loan been modified, the modified
15 information would have been put into our system.
16 BY MR. WESTBROOK:
17 Q.  And it's your understanding that any modified
18 information contained in this document was not
19 put into CMS's system?
20 A.  To the best of my knowledge, yes.
21 Q.  Turning to the second to last page, it's numbered
22 1728, looks like there are two signature lines,
23 right?
24 A.  Correct.
25 Q.  One for CitiMortgage, Inc., and one for Anthony

Page 40

1  A. Macholtz, right?
2  A.  That's correct.
3  Q.  Appears to be a signature above Anthony A.
4  Macholtz, fair?
5  A.  Yes.
6  Q.  Appears to be a blank above the CitiMortgage
7  signature line, fair?
8  A.  Correct.
9  Q.  And no signature line on this page or the
10 preceding page or the following page for Dena
11 Macholtz, right?
12 A.  That's correct.
13 Q.  We do see on the last page, there's a notary
14 line. It appears Mr. Macholtz's signature may
15 have been notarized. Is that fair?
16 A.  Yes.
17 Q.  Do you have an understanding as to why the terms
18 reflected in these documents were not boarded
19 into CMS's servicing system?
20 A.  To the best of my knowledge, the loan wasn't
21 modified by Citi prior to boarding into CMS.
22 Q.  Your understanding then is CMS having reviewed
23 this determined that there wasn't a valid
24 modification reflected by these documents?
25 A.  To the best of my knowledge, that is the case.

Page 41

1  Q.  Do you know how they came to that conclusion, how
2  CMS came to that conclusion?
3  A.  My understanding would be that this agreement
4  hasn't been signed by CitiMortgage and the
5  final -- the terms and modifications were not
6  transmitted to CMS as such.
7  Q.  Do you have an understanding as to whether apart
8  from the initial load of documents and servicing
9  information from CitiMortgage to CMS regarding
10 this loan if there were any communications
11 between CMS and CitiMortgage about the 2013
12 modification or proposed modification?
13     MS. LAPIN: I thought it was asked and
14 answered, but go ahead and answer.
15     MR. WESTBROOK: I think I asked about
16 the lawsuit before.
17     MS. LAPIN: Maybe that was the
18 distinction.
19     THE WITNESS: I'm unaware of any
20 communication.
21     MS. LAPIN: This one was just about a
22 mod?
23     MR. WESTBROOK: Right.
24 BY MR. WESTBROOK:
25 Q.  We just looked at the signature page on this, and

Page 42

```
1        I'll ask you to look back at it again.  I
2   apologize.  It's page 1728.  We saw that there
3   appears to be no signature above the
4   CitiMortgage, Inc., line, right?
5   A.  That's correct.
6   Q.  Have you seen any version of this document that
7       shows a signature in that area?
8   A.  Not to my recollection, no.
9           MS. LAPIN:  For CitiMortgage?
10          MR. WESTBROOK:  For CitiMortgage.
11          MS. LAPIN:  I think you and I have had
12      many discussions about that.  Off the record.
13          (Discussion off the record.)
14          (Exhibit 6 marked.)
15  BY MR. WESTBROOK:
16  Q.  I'm handing you what's been marked Exhibit 6.
17      This document has a whole bunch of recording
18      information and stamps at the top.  I'll ask you
19      to just ignore those for the time being.
20          But it bears the caption, "Anthony A.
21      Macholtz and Dena G. Macholtz, plaintiffs, versus
22      CitiMortgage, Inc., defendants."  Do you see
23      that?
24  A.  Yes.
25  Q.  The title of the document, which is close to the
```

Page 43

```
1   bottom of the page, it says, "Stipulated Order in
2   Recordable Form Setting Aside Foreclosure Sale
3   and Rescinding Sheriff's Deed."  Do you see that?
4   A.  Yes.
5   Q.  Is it your understanding that this document would
6       have come to CMS from CitiMortgage when CMS
7       became the servicer of the Macholtzs' loan?
8   A.  To the best of my knowledge, we would have
9       received it as part of the transfer file.
10  Q.  I'll ask you to go to the following page.  The
11      last paragraph before the date and signature, it
12      says, "It is further ordered that plaintiff,
13      Anthony Macholtz, hereby reaffirms and restates
14      the terms and conditions on the original note and
15      mortgage executed on or about September 1, 2005,
16      which mortgage was recorded on or around
17      October 4, 2005, at the Berrien County Register
18      of Deeds at liber 2651, page 1406, except as
19      modified, pursuant to the parties' loan
20      modification agreement entered as of December 26,
21      2012, and effective as of January 1, 2013, which
22      is current, remains in full force and effect."
23      Do you see that?
24  A.  Yes.
25  Q.  This appears to refer to the document we were
```

Page 44

```
1   just looking at, Exhibit 5; is that fair?
2           MS. LAPIN:  Objection.  Form,
3       foundation.
4           THE WITNESS:  It does appear to refer
5       to that document.
6   BY MR. WESTBROOK:
7   Q.  It's the same date, so it says, "Entered
8       December 26, 2012, effective January 1, 2013."
9       That's consistent with what we saw in Exhibit 5,
10      right?
11  A.  Yes.
12  Q.  Given the existence of this court order, is it
13      your understanding that Exhibit 5, the
14      modification reflected there, needed to be signed
15      by CitiMortgage to be effective?
16          MS. LAPIN:  I'm just going to object.
17      Form, foundation.  I don't think he can speak to
18      that because he doesn't --
19          MR. WESTBROOK:  If he doesn't know, he
20      doesn't know.
21          THE WITNESS:  I don't know.
22  BY MR. WESTBROOK:
23  Q.  I think you testified hopefully about this
24      already so I don't want to belabor it, but just
25      to be clear, when we talked about comparing what
```

Page 45

```
1   was in that paragraph that starts, "It is further
2   ordered," the final full paragraph on the page
3   Bates marked 297, you don't have any reason to
4   believe that the modification referred to in that
5   paragraph is something other than the one we saw
6   in Exhibit 5, do you?
7           MS. LAPIN:  Just going to object.
8       Form, foundation.
9           THE WITNESS:  It does appear to refer
10      to Exhibit 5.
11          (Exhibit 7 marked.)
12  BY MR. WESTBROOK:
13  Q.  Handing you what's been marked as Exhibit 7, and
14      I'll represent that it's two separate documents
15      that are together here.  First being another
16      letter with the Dykema logo in the top left and
17      then the next page appearing to be a check or
18      payment instrument.  Are you with me?
19  A.  Yes.
20  Q.  The first page which is the Dykema letter, it's
21      addressed to CitiMortgage, subject line, Anthony
22      Macholtz, and it says, "To Whom it May Concern,
23      Enclosed please find the payment in the amount of
24      $5,242.77 from borrower, Anthony Macholtz, which
25      constitute the amounts owed for February, March,
```

Page 46

1  and April under the enclosed loan modification
2  agreement.  Please contact me if you have any
3  questions."  Sincerely, and then it's signed
4  again Mark J. Magyar, Dykema Gossett, PLLC.  Did
5  I read that correctly?
6  A.  Yes.
7  Q.  The following page, which is not sequentially
8      Bates marked, the first page is 1843 and then the
9      next page is 1555.  But the page marked 1555 does
10     seem to reflect the payment in the amount of
11     $5,242.77; is that right?
12  A.  Yes.
13  Q.  In that payment instrument, which I think it's a
14     counter check from a bank, I'm not going to ask
15     you to testify to that, but it does say paid to
16     the order of CMI, right?
17  A.  Yes.
18  Q.  Do you know if these documents came through to
19     CMS from CitiMortgage as part of the initial
20     transfer of servicing?
21  A.  To the best of my knowledge, they would have come
22     across with the transfer of file.
23  Q.  Do you know if this document within CMS's file
24     system -- its system for keeping these loan
25     files, if this letter document that's the first

Page 47

1  page would have been associated or is associated
2  with other documents?
3          And specifically I'm interested to know
4  whether there's a link or attachment between the
5  document like this and the things that it refers
6  to, the check, the modification agreement that
7  are referred to in the letter.
8          MS. LAPIN:  I'm just going to object to
9  form.
10         MR. WESTBROOK:  I'm hoping he can just
11  help me out on this.
12         MS. LAPIN:  I think I know what you're
13  saying, but what I think may not matter.
14         MR. WESTBROOK:  Just walk through a
15  scenario.  I can make it easier.
16         MS. LAPIN:  That's okay to --
17         MR. WESTBROOK:  I think I can make it
18  easier.
19  BY MR. WESTBROOK:
20  Q.  Is there a means of pulling up a document like
21     this within CMS's system?  Could you go on a CMS
22     computer or terminal and pull up this document?
23  A.  Yes.
24  Q.  If you were looking at this document in the
25     system, would there be a way to view documents

Page 48

1      that are related to it?
2  A.  Yes.
3  Q.  Is it links or attachments?  What is it?
4          MS. LAPIN:  Same objection as I've
5  stated before.  Just in terms of, like, policy,
6  procedure, proprietary information, but you can
7  testify.
8          THE WITNESS:  You know, it would be via
9  links, basically.  It would click on a link and
10  pull up the documents.
11  BY MR. WESTBROOK:
12  Q.  Do you know if there were any documents linked to
13     this page we're looking at that's marked 1843?
14  A.  I'm unaware.
15  Q.  Just for background, I'm not asking about this,
16     but I'm interested in the fact that it says, "The
17     enclosed loan modification agreement," where as
18     far as I can tell, the subsequent Bates numbers
19     don't show a loan modification agreement.
20         Let me ask you this question.  You did
21     review this page prior to the deposition today?
22  A.  I don't recall seeing it.
23  Q.  All right.  You may have, but you don't recall?
24  A.  Correct.
25  Q.  So I'm going to assume that means you also

Page 49

1  wouldn't recall seeing a modification agreement
2  that's referred to in it?
3  A.  Possibly not.
4  Q.  I'm going to ask you to do a little arithmetic
5     here and bear with me.  The amount $5,242.77, it
6     says in this document that that reflects payments
7     for three months.  You recall that.  If we divide
8     up that amount $5,242.77, do you know what number
9     that calculates out to?
10  A.  Not without a calculator.
11  Q.  Would it seem correct that the amount of
12     $5,242.77 divided by three comes to $1,747.59?
13     That's the number I'm reading from Exhibit 5.
14         MS. LAPIN:  I guess I'll object on the
15  grounds that math would speak for itself.
16         THE WITNESS:  It sounds approximately
17  correct.
18         MR. WESTBROOK:  Attorneys aren't the
19  best at math, but technology is wonderful.
20  BY MR. WESTBROOK:
21  Q.  Do you have any reason to believe that the
22     payment that's referred to in Exhibit 7, that
23     $5,242.77, wasn't made by Anthony Macholtz?
24  A.  I have no reason to believe that.
25  Q.  Do you have any reason to believe CitiMortgage

Page 50

1       didn't receive that payment?
2   A.  No.
3   Q.  Do you have any reason to believe that
4       CitiMortgage did not process that payment and
5       apply it to the loan account?
6   A.  No.
7   Q.  Do you know if they did?  Do you know if
8       CitiMortgage did process the payment and apply it
9       to the loan account?
10  A.  To the best of my knowledge, it was processed and
11      applied.
12  Q.  Now, if the modification agreement that we looked
13      at in Exhibit 5 were valid, I understand that
14      it's CMS position that it wasn't, but if it were
15      valid and the first three months' payments were
16      made under the agreement for February, March, and
17      April of 2013, then the modified loan would have
18      been current as of beginning of May of 2013,
19      right?
20          MS. LAPIN:  Just going to object.
21      Form, foundation, calls for speculation.  Could
22      call for a legal conclusion as well.
23          THE WITNESS:  Can I have a minute to
24      refer back to the prior exhibit?
25  BY MR. WESTBROOK:

Page 51

1   Q.  Of course.
2   A.  I'm sorry, would you mind repeating the question?
3   Q.  If the modification agreement were valid in
4       Exhibit 5 and the first three months' payments
5       were made under that agreement for February,
6       March, and April of 2013, the modified loan would
7       have been current as of the beginning of May of
8       2013, right?
9           MS. LAPIN:  Same objection.  Form,
10      foundation, calls for speculation.  It also could
11      call for a legal conclusion and assumes -- you
12      said --
13          MR. WESTBROOK:  You said your
14      objection.
15          THE WITNESS:  To the best of my
16      knowledge, that would be correct, provided any
17      extraneous matters have been taken care of.
18          MR. WESTBROOK:  Understood.
19  BY MR. WESTBROOK:
20  Q.  Do you know if CitiMortgage treated the loan as
21      current as of May 1st, 2013?
22  A.  I don't know.
23  Q.  As you sit here now, and we'll look into
24      documents on this, but as you sit here now, do
25      you know if CMS's records show that the loan was

Page 52

1       current as of May 1st of 2014?
2   A.  Not to my knowledge.
3   Q.  They don't show that?
4   A.  As far as I can recall.
5   Q.  During the time frame of the transfer of the
6       servicing to CMS from CitiMortgage on this loan,
7       did CMS have any mechanism for changing the loan
8       parameters provided by a predecessor servicer
9       that CMS discovered that the provided parameters
10      were incorrect?
11          MS. LAPIN:  Form, foundation.  Also
12      policy, procedure.  Possible proprietary
13      information.
14          THE WITNESS:  I don't know.
15          (Exhibit 8 marked.)
16  BY MR. WESTBROOK:
17  Q.  I'm handing you Exhibit 8.  Appears to be in the
18      form of a computer printout of some sort; is that
19      fair?
20  A.  Yes.
21  Q.  Date at the top of March 12, 2019, top right
22      there, right?
23  A.  That's correct.
24  Q.  I assume this is a form of document that you're
25      familiar with?

Page 53

1   A.  Yes.
2   Q.  What is it?
3   A.  This is the -- let's see.  The servicing notation
4       history of Carrington.
5   Q.  This is a report or a print-off that comes from a
6       CMS computerized system?
7   A.  Yes.
8   Q.  The servicing system?
9   A.  Correct.
10  Q.  Is there a name for the servicing software?
11          MS. LAPIN:  I'm just going to object on
12      the proprietary, on that ground.
13          THE WITNESS:  Yes.  It's known by
14      various names.  Fiserve, Sagent.
15  BY MR. WESTBROOK:
16  Q.  It's not something that was developed by CMS;
17      it's a commercially available product?
18  A.  Yes.
19  Q.  First page it's marked No. 28.  Close to the top
20      -- well, first we'll go through some of this
21      identification information.
22          It has the names Anthony A. Macholtz
23      and Dena G. Macholtz, right?
24  A.  Correct.
25  Q.  It has an address underneath of 6140 28th Street,

1  which I'll represent to you is my firm's address,
2  but then next to it on the right-hand side under
3  property it has that 1886 Russell Road, Baroda,
4  address, right?
5  A.  That's correct.
6  Q.  Underneath that on the left, there's a column
7  labeled, "Dates," right?
8  A.  Correct.
9  Q.  Has a paid to date of August 1st of 2009, right?
10 A.  Yes.
11 Q.  That reflects that according to CMS's -- the
12     information in CMS's servicing system, that is
13     the date this loan was paid up to, right?
14 A.  Yes.
15 Q.  And then it says, "Next due. Apparently the
16     following month, September 1st, 2009, right?
17 A.  That's correct.
18 Q.  It reflects a last payment date of November 22,
19     2013; is that fair?
20 A.  Yes.
21 Q.  Then it says, "Audit DT, January 11, 2017,"
22     right?
23 A.  Yes.
24 Q.  I assume that means audit date?
25 A.  That would be a fair assumption.

1  Q.  Is the audit the same procedure that we discussed
2      earlier in the deposition of the process of CMS
3      reviewing a file coming over from a predecessor?
4  A.  To the best of my knowledge, yes.
5  Q.  Do you know if CMS has a standard practice of
6      creating an audit report as a result of its
7      initial review of a loan file that comes in from
8      a predecessor servicer?
9          MS. LAPIN:  What was that question?
10         MR. WESTBROOK:  I'm talking about the
11     audit.  There's an audit date there, and the
12     question is whether there was a standard practice
13     at CMS of generating an audit report in
14     connection with receiving a file from a
15     predecessor servicer.
16         MS. LAPIN:  I'll have my usual
17     objection for policy and procedure proprietary.
18         THE WITNESS:  I would think the fact
19     that an audit date has been generated would lead
20     to an actual assumption that there are policies
21     and procedures in place for that.
22 BY MR. WESTBROOK:
23 Q.  Have you seen or do you remember having seen an
24     audit report with respect to this Macholtz loan
25     file?

1  A.  I don't remember seeing one, no.
2  Q.  Have you seen audit reports with respect to any
3      other loan files?
4  A.  No.
5  Q.  So would you know what one looked like?
6  A.  I would think with my experience if I saw one, I
7      would know by its contents what it would be.
8  Q.  What type of information would you expect to see
9      on an audit report?
10 A.  I would expect to see loan balances.  Basically
11     this information when the loan is paid, two
12     previous payments, things like that, interest
13     rates.
14 Q.  And would you expect to find something like
15     potential conflicts in the documents or red flags
16     or anything along those lines in an audit report
17     if those conditions existed within the file?
18 A.  I'm not sure.  It would be speculation.
19 Q.  Looks like there is some information on this
20     first page that's blacked out.  Some of it I can
21     tell what it is.  For example, upper right it
22     says, "History for Account," and my assumption
23     would be the following information that's blacked
24     out would be the actual account number.  Is that
25     fair to say?

1  A.  Yes.  It would be the actual Carrington account
2      number to be specific I would think.
3  Q.  I'm not asking you to reveal what the precise
4      information is on the stuff that's blacked out,
5      the rest of the information that's blacked out on
6      the first page, but I'm interested to know what
7      type of information it is, if you know, or can
8      provide any insight on that.
9          MS. LAPIN:  Go off the record.
10         (Discussion off the record.)
11         MS. LAPIN:  Personal information, phone
12     numbers, somebody's name sometimes.  If there was
13     something with counsel, that would have been
14     stuff that I would have -- personal information
15     more likely.
16         THE WITNESS:  Yeah.
17 BY MR. WESTBROOK:
18 Q.  I'm sorry, could you remind me what the name was
19     you used for this document?
20 A.  This is the servicing notes history.
21 Q.  Is it fair to say the servicing notes history,
22     you would expect servicing notes history to
23     include things like communications between the
24     borrower and CMS, right?
25         MS. LAPIN:  Object.  Form, foundation,

Page 58

1    calls for speculation.
2         THE WITNESS:  For the most part, yes.
3    BY MR. WESTBROOK:
4    Q.   Have you reviewed this document before the
5         deposition today?
6    A.   Yes.
7    Q.   I'm going to stip a lot of this content, which
8         I'm sure will be a relief to everybody.
9         MS. LAPIN:  I was going to say bummer;
10   it's so enticing.
11        MR. WESTBROOK:  I've had cases where
12   I've had to go through just page after page.
13        MS. LAPIN:  Depends on what the issue
14   is.  I have one, too, where there were calls
15   every single day for, like, two months about an
16   issue.  And, yeah, I agree, it depends on the
17   issue.
18   BY MR. WESTBROOK:
19   Q.   I would like you to turn to the page that's
20        numbered 64.  There are codes.  I hope you can
21        tell me what it means.  I'm looking close to the
22        middle of the page.  On the left-hand column it
23        says 083118 and then under the transaction amount
24        it says T:00997 and then the beginning of the
25        line that I'm looking at says IBTT Dena G.

Page 59

1    Macholtz.  Do you see that?
2    A.   Yes.
3    Q.   Does IB stand for inbound telephone call?
4    A.   Typically, yes.
5    Q.   What about TT, what does that mean?
6    A.   Talked to, typically.
7    Q.   I see.  All right.
8         So the rest of that line is Dena G.
9    Macholtz.  Gave last four of SS.  Add contact
10   info, not updated.  C & D on file.  Gave payoff
11   amount XER to SSD.  She is following up on
12   RIEOCMO.
13        There's some codes or abbreviations
14   that I'm not familiar with there that I hope you
15   can help me with.
16        C & D, what does that stand for?
17        MS. LAPIN:  I'm just going to just
18   object with the understanding that it could --
19   you know, privilege proprietary information.
20        MR. WESTBROOK:  If it is.
21   BY MR. WESTBROOK:
22   Q.   What does C & D stand for?
23   A.   Typically, C & D stands for cease and desist.
24   Q.   Then it says, "Gave payoff amount XER."  Do you
25        know what XER would refer to?

Page 60

1    A.   Again, typically that would notate transfer.
2    Q.   What about SSD?
3    A.   I don't know what SSD is.
4    Q.   Do you know if it's a department within CMS?
5    A.   It would be a natural assumption, but I don't
6         know.
7    Q.   It says she is following up on RIEOCMO.  Any
8         insights there?
9    A.   Do you mind if we just read forward and back in
10        the notes because that could indicate what SSD
11        means.
12   Q.   Go ahead.  If that may be helpful, please.
13   A.   My apologies for taking your time, but I can't
14        see at this point any indications as to what SSD
15        is, and I'm not about to hazard a guess.
16   Q.   Understood.  Any insights on the RIEOCMO at the
17        end of that line?
18   A.   RI typically would notate reinstatement.  The
19        EOCMO, I don't know.
20   Q.   This entry seems to reflect that Dena Macholtz
21        called CMS on the date August 31 of 2018, right?
22   A.   Yes.
23   Q.   That would be a little over five years after the
24        divorce from Anthony Macholtz, wouldn't it?
25   A.   That's correct, yes.

Page 61

1    Q.   Do you know why Dena was still listed as a
2         borrower at CMS?
3    A.   No.
4    Q.   Is there an indication or do you otherwise know
5         why Dena Macholtz was allowed to speak to CMS
6         about the loan?
7         MS. LAPIN:  Objection.  Calls for
8    speculation.
9         THE WITNESS:  No, I don't know.
10   BY MR. WESTBROOK:
11   Q.   Can you tell from this entry what information was
12        provided to Dena in connection with this contact?
13   A.   On the entry that we were just speaking where it
14        says, "Inbound, talked to Dena G. Macholtz," or
15        are you referring to a different entry?
16   Q.   That entry, the one you have started reading
17        there.
18   A.   It looks like the information given would have
19        been the payoff amount.
20   Q.   All right.  Can you tell from this page if there
21        were any changes made to the loan account as a
22        result of that contact?
23   A.   From the entirety of the notes within this page?
24   Q.   Yes.
25   A.   I don't see any alterations to the account were

Page 62

1    made.
2    Q.   All right.
3    A.   From my review of this one page.
4    Q.   I'd like you to flip to the page that's numbered
5         68, please.  I'm going to ask you to help me
6         interpret the several entries that start with the
7         very bottom one on this page.  Post date
8         10/10/18.  Transaction amount, column T,
9         column -- or colon 07534.  Starts with
10        IB-inbound, borrower intent, keep property.  See
11        that, right?
12   A.   The very last two lines?
13   Q.   Yes.
14   A.   Yes.
15   Q.   The IB, is it your understanding that that would
16        refer to an inbound telephone call?
17   A.   That's my understanding, yes.
18   Q.   Now, the following page, can you tell if this is
19        a separate -- information about a separate
20        contact or if it's a continuation of that entry
21        from the prior page?
22   A.   It would suggest that this is a separate item.
23        The transaction amount, as it calls it, is
24        actually what we call a teller number, which is
25        an employee I.D. number.  And the one at the

Page 63

1    bottom of page 68 is different to the one at the
2    top of page 69, so it would suggest this is a
3    separate conversation.
4    Q.   That's helpful.
5         Moving down a couple of lines, we're on
6         the page that's numbered 69.  I'm looking at the
7         line that starts, "IBC XFRD to me already
8         verified."  Do you see that?
9    A.   Yes.
10   Q.   Then it continues, "BWR 2 called in asking about
11        FC sale date and TAD offered to XFR to assigned
12        rep and she declined."  Do you see that?
13   A.   Yes.
14   Q.   Am I right in assuming that this is discussing an
15        inbound telephone call?
16   A.   That's how it would appear, yes.
17   Q.   And then XFRD would suggest to me that whoever is
18        making the notation is indicating that the call
19        was transferred to him or her.  Is that a fair
20        assumption?
21   A.   Yes.
22   Q.   It says, "Already verified."  Does that refer to
23        the identity of the caller having already been
24        verified?
25   A.   Yes.

Page 64

1    Q.   All right.  BWR 2, is that short for borrower 2?
2    A.   That's how we understand it or I would understand
3         it, yes.
4    Q.   The co-borrower?
5    A.   Yes.
6    Q.   Do you know if the co-borrower on this account
7         was Dena Macholtz?
8    A.   To my knowledge, the co-borrower is Dena G.
9         Macholtz.
10   Q.   Is there a notation indicating who made the note
11        here?
12   A.   Who made the note, that's typically identified by
13        the T:05223.  Like I said previously, that's
14        identifiable as the teller number, which is an
15        employee I.D.
16   Q.   All right.  Another initialism that I'm sure we
17        can understand but I wanted you to verify, it
18        says, "BWR 2 called in asking about FC sale
19        date."  FC refers to foreclosure, right?
20   A.   Yes.
21   Q.   Now, at the end of that entry it says, "Offered
22        to XFR to assign rep and she declined," and then
23        after that it says "-JDW-CA."  Do you know what
24        that entry, the "JDW-CA" means?
25   A.   I cannot give you a definitive answer, but

Page 65

1    sometimes the rep who is taking the call will put
2    their initials in the location, so it's probably
3    someone with the initial JDW in California.  That
4    would have been my assumption.
5    Q.   Do you know, have you made any effort to contact
6         anyone who spoke directly with the borrowers in
7         this account?
8    A.   No, I haven't.
9    Q.   Do you know if anyone else at CMS has done that
10        in response to this lawsuit?
11   A.   I don't have any knowledge of that.
12   Q.   If you could turn now to the page that's numbered
13        81.  Here in the top of the page, there's an
14        entry that's dated January 29 of 2019 and then
15        the teller code is 9863.  Appears to be --
16        following that, it looks like the date again,
17        1/29/2019.  Are you with me?
18   A.   Yes.
19   Q.   It says, "Acct review regarding 2013 loan
20        modification offer:  The borrower and their
21        counsel didn't perform and enter into the
22        modification of 2013 as per the prior history
23        notes.  The borrower went through a divorce and
24        only he signed where the wife was supposed to
25        sign too.  The account was in litigation and the

Page 66

1    borrower's counsel never provided the required
2    divorce QCB, hence the 2013 mod was canceled,
3    period, BA.  Did I read that correctly?
4  A.    Yes.
5  Q.    **Says account review or acct review at the**
6        **beginning, right?**
7  A.    Yes.
8  Q.    **Does that refer to a process at CMS?**
9              MS. LAPIN:  Which one are you on?
10       Which one did you just say?
11             THE WITNESS:  Eighty-one.
12             MS. LAPIN:  I know I'm on 81, but I
13       guess I'm looking at the ...
14             MR. WESTBROOK:  The T number is 9863.
15             MS. LAPIN:  Oh, okay.
16             THE WITNESS:  It's merely referring to
17       a review of the account which are the result of
18       various reasons that I'm not privy to.
19  BY MR. WESTBROOK:
20  Q.    **Do you know if the person doing that review would**
21        **have been the same person generating this entry?**
22  A.    Yes.  I would expect it to be the same person who
23        typed the entry.
24  Q.    **Do you know what that person's job title would**
25        **have been?**

Page 67

1  A.    No.
2  Q.    **Can you tell what triggered the person making**
3        **this entry to review this 2013 loan modification?**
4  A.    In my review of the many documents that have been
5        presented to me before this hearing, I was made
6        aware of a communication that included this
7        between CMS and foreclosure counsel at the time,
8        so this was probably made at or around the time
9        of that communication.
10  Q.    **All right.  Do you have an understanding of what**
11        **the goal of the account review was?**
12  A.    Purely from what is written, it would be to
13        review, for want of a better phrase, what went on
14        during the 2013 loan modification review.
15  Q.    **Do you know what information was reviewed?**
16  A.    I can only speak to what we see here and what I
17        recall being referred to within the other
18        communication, and that's the borrowers were due
19        to provide certain documents to complete the
20        modification, which as far as I'm aware, they
21        never presented those to complete the
22        modification.
23  Q.    **Are you referring to communications between**
24        **CitiMortgage and the borrowers?**
25  A.    Yes.  CitiMortgage and I believe the borrowers'

Page 68

1        counsel at the time.
2  Q.    **Those are documents you've seen?**
3  A.    I've seen documents referring to that
4        communication.
5  Q.    **All right.  Is that to say you haven't seen the**
6        **communications themselves?**
7  A.    From memory, the document that I'm referring to
8        contained an excerpt of notes from Citi's
9        notation file at that time, which indicated the
10       communication.  I know it's kind of a long-winded
11       way of explaining.
12  Q.    **I appreciate that.  Precision is the goal.**
13             **Maybe you know this and maybe you**
14        **don't, but I'll just ask you, looking at that**
15        **same entry that we've been talking about, it says**
16        **the borrower and their counsel didn't perform and**
17        **enter into the modification of 2013 as per the**
18        **prior history notes.  What I'm wondering is if**
19        **you have an understanding of what that phrase**
20        **"prior history notes" refers to.**
21  A.    I would think that it is referring to the notes
22        from Citi.
23  Q.    **Okay.  Were the notes from CitiMortgage something**
24        **that you reviewed in connection with preparation**
25        **for today's deposition?**

Page 69

1  A.    To an extent.  I wouldn't say that I reviewed
2        every single document, but I did give them a
3        cursory glance.
4  Q.    **Do you recall seeing anything in those notes**
5        **about borrower's counsel not providing required**
6        **deed for the divorce?**
7  A.    I don't remember.
8  Q.    **Do you know if CMS's file for the loan reflects**
9        **or contains a quitclaim deed from Dena to Anthony**
10        **that was in CMS's file?**
11  A.    I can't remember seeing one.
12             (Exhibit 9 marked.)
13  BY MR. WESTBROOK:
14  Q.    **This document is marked Exhibit 9.  It's**
15        **actually, again, a series of documents, actually**
16        **a series of copies of the same document.  There's**
17        **five pages.  I'll represent to you that they are**
18        **identical other than certain markings on them,**
19        **markings and labels, but the title of it is**
20        **quitclaim deed.  And there's a signature line in**
21        **the middle of the page that says "Dena Gail**
22        **Macholtz."  Do you see that on the first page**
23        **there?**
24  A.    Yes, I do.
25  Q.    **And each of these pages, these five pages, has a**

Page 70

1    CMS/WILM Bates number on them, right?
2  A.  That's correct.
3  Q.  You recall seeing a copy of this document during
4      your review of documents in connection with this
5      deposition?
6  A.  Yes.
7  Q.  You do recall or you don't?
8  A.  Sorry.  I don't recall actually seeing this
9      document, no.
10 Q.  I'll just have you quickly flip back to the
11     beginning of Exhibit No. 8, the servicing notes
12     history.
13         I wanted to move over a column from
14     where we were looking before.  There's the dates
15     column that we talked about and then there's the
16     current balances column.  Do you see that?
17 A.  Yes.
18 Q.  And it shows a principal amount of $135,314.46,
19     right?
20 A.  Correct.
21 Q.  Then it looks like it shows an escrow deficiency
22     of $58,149.53.  Did I read that right?
23 A.  Yes.
24 Q.  Does that reflect what CMS's servicing notes or
25     servicing system showed for those amounts as of

Page 71

1      the print date that's reflected on this document?
2  A.  That's what I would understand, yes.
3  Q.  And the print date is March 12, 2019, right?
4  A.  Correct.
5  Q.  Assuming the 2013 modification reflect the terms
6      reflected in Exhibit 5 that we talked about quite
7      a bit before.  Assuming that were valid, CMS's
8      accounting for loan as of March 12 of 2019 would
9      have been wrong, right?
10         MS. LAPIN:  Objection.  Form,
11     foundation, calls for speculation, and I would
12     say is against the facts in evidence but go ahead
13     and answer.
14         THE WITNESS:  Would you mind repeating
15     the question?
16 BY MR. WESTBROOK:
17 Q.  If the Exhibit 5, the terms of that were part of
18     a valid modification agreement on this account,
19     then CMS accounting for the loan would have been
20     wrong as of March 12 of 2019, right?
21         MS. LAPIN:  Same objection.
22         THE WITNESS:  Obviously, doing the
23     calculation accurately, the amount due appear to
24     differ by a small amount.  I don't have an
25     explanation for that.  It could have been within

Page 72

1      that six-year period from the modification
2      agreement if you want to say and March of 2019
3      there may have been some adjustments within the
4      loan itself that would have caused that
5      difference.
6  Q.  I understand.  I'm interested to know.  So we've
7      got a principal balance on Exhibit 8 showing of
8      $135,314 and change, right?
9  A.  Yes.
10 Q.  We have a principal balance or a new principal
11     balance reflected on Exhibit 5 on page 1723 of
12     $194,401.23, right?
13 A.  19440123.
14 Q.  Right.  So if only a small amount of payments
15     were made between 2013, beginning of 2013, and
16     March of 2019, you wouldn't expect the principal
17     balance to have gone down to $135,314.43, right?
18         MS. LAPIN:  Based on the assumption
19     that the loan modification was valid?  That's
20     what you're asking?
21         MR. WESTBROOK:  Yes.
22         MS. LAPIN:  Yeah.  Which, again, I
23     think his testimony was it wasn't, but -- so
24     that's why I think the question is speculative.
25 BY MR. WESTBROOK:

Page 73

1  Q.  Let's approach it this way.  A principal balance
2      doesn't go down unless you make payments on the
3      loan, right?
4  A.  That's my understanding, yes.
5  Q.  And escrow deficiency may go up as you don't make
6      payments on the loan if there are escrows
7      required to be paid to the servicer, right?
8  A.  Yes.
9  Q.  The document, the servicing notes history, does
10     that document payments going out and coming in?
11 A.  I'm just looking through to see the contents of
12     the exhibit.  Typically, inbound and outbound
13     payments are separately recorded in the
14     transaction history.  If, say, escrow payments,
15     tax insurance, et cetera, would possibly have
16     been notated in this, but the actual financial
17     records would be in the transaction history.
18 Q.  The transaction history, that's a document that
19     you've also reviewed in connection with your
20     preparation for this deposition, I assume?
21 A.  Yes.
22 Q.  Do you recall if looking at the CMS transaction
23     history if there's ever a time where the escrow
24     deficiency was nonexistent and that the escrow
25     account was at zero or some positive number?

Page 74

```
1   A.   I don't recall.
2   Q.   I'd like you to go ahead and turn to -- we're
3        still in Exhibit 8, but the page that is numbered
4        84.
5                 Very near the middle of the page dated
6        February 28, 2019, and then the T number there is
7        5341.  Are you with me there?
8   A.   Yes.
9   Q.   It looks like there might be a phone number there
10       that's blacked out.  See I.D.  Maybe caller I.D.?
11  A.   Yes.
12  Q.   It says Anthony A. Macholtz, a few other
13       notations.  It says, "BORR 1 called to ask what
14       PO AMT WLD B if wanted to pay off loan."  Am I
15       correct in interpreting that to mean borrower 1
16       called to ask what payoff amount would be if
17       wanted to pay off the loan?  PO would be payoff?
18  A.   That's my assumption, yes.
19  Q.   And then it says, "Trans to SSD for further
20       help."  Do you see that?
21  A.   Yes.
22  Q.   It looks from this note like CMS fielded a phone
23       call from Anthony Macholtz on February 28 of
24       2019, right?
25  A.   Correct.
```

Page 75

```
1   Q.   Appears the call was about a payoff, right?
2   A.   Yes.
3   Q.   Do you know if Anthony Macholtz asked CMS for a
4        redemption amount during that call?
5   A.   All I can refer to is actual notation within the
6        line item which merely says that he asked for
7        payoff amount.
8   Q.   Doesn't look like there's another notation
9        following this what appears to be a transfer to
10       someone else, right?
11  A.   Your question was again, sir?
12  Q.   I haven't seen and I'm wondering if you can
13       confirm that there isn't a notation that reflects
14       what happened after the transfer that's reflected
15       here.  It says, "Trans to SSD for further help.
16       Do you see any other notation here or on the
17       following pages that would reflect what was
18       discussed after the transfer?
19  A.   Yeah.  Obviously, referring to 022819, teller
20       number 05341.  Within that notation it says
21       transfer to SSD, that I already established I'm
22       not quite sure what that abbreviation is for
23       further help.
24                 And then on page 85, if you go down
25       kind of a fourth of the way down, teller I.D.
```

Page 76

```
1        7503.  In fact, that is the same person.  No,
2        sorry.  SSD for further help.
3                 Teller 7503 is the notated inbound
4        call, borrower, intent not available.  Within
5        that notation it has a transfer call to this new
6        representative from the board.
7   Q.   I see.  I see.  I see what you're looking at here
8        on page 85.
9                 About a quarter of the way down there,
10       I'm looking at language that says, "Ordered
11       payoff per customer's req, request, to be
12       e-mailed to him.  Would like to know amount
13       needed to redeem.  Asked if there were W/O
14       options available.  Advised only redemption since
15       already went to FCL sale, right?
16  A.   Yes.
17  Q.   And then it says MPP TX 44439.  Do you see that?
18  A.   Yes.
19  Q.   Do you have any idea what the MPPTX stands for?
20  A.   I have no clue.
21  Q.   Could it be someone with the initials MPP in
22       Texas?
23  A.   Very possibly, but I don't know.
24  Q.   As you sit here today, you don't know who that
25       person is that made that note?
```

Page 77

```
1   A.   Not a clue.
2   Q.   Is that something you could find out if you had
3        access to CMS systems?
4   A.   Yes.
5   Q.   Do you know if CMS told Anthony Macholtz what the
6        redemption amount of the property was during that
7        call?
8   A.   There's no indication as to an amount being
9        disclosed within that conversation.
10  Q.   Have you heard a recording of that phone call?
11  Q.   Was that provided to you by your counsel?
12  A.   Yes.
13  Q.   All right.  Had you heard it prior to being
14       provided to you by your counsel?
15  A.   No.
16  Q.   Did you hear in the recording a person stating
17       that the redemption amount be the same as the
18       payoff amount?
19  A.   I don't recall.
20  Q.   Do you know what the payoff amount would have
21       been at this time that February 28th of 2019?
22  A.   No.  It was mentioned within the call that it
23       would be -- the borrower requested it be e-mailed
24       to him, so it's not something that we'd be privy
```

1   to immediately, because there's different amounts
2   involved, attorney fees and stuff.
3 Q. Do you know if a payoff was e-mailed to him by
4   CMS?
5 A. On page 86 about halfway down, there's a notation
6   3/7/19, teller number 09540, and it's a redacted
7   e-mail to TonyM@redactedAnthonyAMacholtz. I
8   would assume that that would have been the payoff
9   e-mail being sent to the borrower.
10 Q. All right. Looks like there's some codes that
11   are on the following couple lines 035 done
12   March 7, 2019, by GLR9540. Do you know if that
13   number 035 reflects some kind of standard form
14   that's used by CMS or something else?
15 A. It would. I don't know what the individual code
16   is, but I would refer to something.
17 Q. Like a document or form or something like that?
18 A. I'm not entirely sure.
19 Q. Do you know -- it says TSK TYP. Maybe task type?
20 A. Yes.
21 Q. And then 173-PQQ request, do you know what that
22   means?
23 A. I don't know the individual task number 173.
24   PLQ, I would assume, means payoff quote, but I
25   don't know.

1 Q. And then after that it says -N. Do you know what
2   means?
3 A. No.
4 Q. I'm sure you're aware that prior to February of
5   2019, which was the date of this entry, CMS
6   caused a foreclosure sale to take place with
7   respect to the Macholtz property, right?
8 A. Yes.
9 Q. Do you know what CMS bid at the sheriff sale of
10   this property?
11 A. No. I don't recall.
12           (Exhibit 10 marked.)
13 BY MR. WESTBROOK:
14 Q. Handing you a document that's marked Exhibit 10.
15   This looks to be on letterhead of Schneiderman &
16   Sherman law firm. Do you see that?
17 A. Yes.
18 Q. And at the top it looks like it's entitled,
19   "Notice of Sale and Pending Foreclosure." Are
20   you with me?
21 A. Yes.
22 Q. Dated August 9 of 2018, right?
23 A. Yes.
24 Q. And addressed apparently to Anthony A. Macholtz
25   and Dena G. Macholtz, right?

1 A. That's correct.
2 Q. Again, in the subject line it refers to the
3   property that's at issue, 1886 Russell Road,
4   Baroda, Michigan, right?
5 A. Yes.
6 Q. The language there on the letter says, "In
7   accordance with the provisions of the mortgage,
8   we have enclosed a copy of the notice of sale
9   publication on the above-captioned property,"
10   right?
11 A. Yes.
12 Q. And then it appears that the enclosure that goes
13   with that letter is the following page entitled,
14   "Short Foreclosure Notice, Berrien County." Is
15   that fair?
16 A. That's fair.
17 Q. Is this a document or have you reviewed these
18   documents before?
19 A. Yes.
20 Q. Now, as of the date of the letter, the enclosure
21   letter, August 9, 2018, CMS had authorized the
22   Schneiderman law firm to conduct a foreclosure
23   sale of 1886 Russell Road, right?
24 A. To the best of my knowledge, yes.
25 Q. And in the notice itself that is reflected on

1   page number 338, it reflects that at the time of
2   the notice, August 2018, CMS claimed that the
3   debt amount owed was $278,457.17. Is that right?
4 A. Yes, that's what was within the notice.
5 Q. Now, a few months later, February 28 of 2019,
6   would the payoff amount for the loan be
7   $278,457.17 or something more than that?
8           MS. LAPIN: Objection. Form,
9   foundation, calls for speculation.
10 BY MR. WESTBROOK:
11 Q. Assuming no payments have been made?
12 A. I'm sorry, I was just reading the notice.
13           MS. LAPIN: If you can't speak to the
14   notice, that's fine.
15           THE WITNESS: I can't speak to the
16   notice. I don't know.
17 BY MR. WESTBROOK:
18 Q. What I'm trying to understand is what the payoff
19   amount -- what the neighborhood of the payoff
20   amount would have been in February of 2019.
21           MS. LAPIN: If he knows.
22           THE WITNESS: I don't know.
23 BY MR. WESTBROOK:
24 Q. Is that something that you could roughly estimate
25   using the information that's shown on Exhibit 8,

Page 82

1      which is dated March 12 of 2019?

2  A.  No.

3  Q.  Adding up the principal balance that's reflected,

4      plus the escrow deficiency, plus fees, would you

5      expect that to get you close to payoff amount as

6      of the date of this print-off?

7           MS. LAPIN:  Same objection.

8           THE WITNESS:  I don't know.  It would

9      be speculation.  I don't know.

10  BY MR. WESTBROOK:

11  Q.  What other amounts would be included in the

12      payoff amount besides the principal balance,

13      escrow deficiency?  Well, I suppose there's

14      interest in there too, but we could calculate

15      that, couldn't we?

16  A.  Typically, it would be principal, interest, tax

17      and insurance which would be within the escrow,

18      attorney's fees, other associated costs.  So I

19      couldn't even guess at what it would be.

20  Q.  But certainly the payoff amount would not be less

21      than the total of the principal, escrow

22      deficiency, and fees?

23           MS. LAPIN:  I'm going to object.

24  BY MR. WESTBROOK:

25  Q.  Right?

Page 83

1           MS. LAPIN:  Form, foundation, calls for

2      speculation.

3           THE WITNESS:  Can you repeat the

4      question?

5  BY MR. WESTBROOK:

6  Q.  We know with certainty that the payoff amount

7      would have to include the principal escrow

8      deficiency and fees, right?

9  A.  Correct.

10  Q.  Wouldn't be less than the total of those things?

11  A.  No.

12          (Exhibit 11 marked.)

13  BY MR. WESTBROOK:

14  Q.  Handing you what I've marked as Exhibit 11.

15      This, again, appears to be on the Schneiderman &

16      Sherman law firm letterhead, dated October 9,

17      2019.  Do you see that?

18  A.  Yes.

19  Q.  Do you know if these -- the following pages are

20      pages that you reviewed in connection with your

21      preparation for the deposition today?

22  A.  Yes, I did.

23  Q.  Can you characterize what they are, what they

24      relate to?

25  A.  These are publication notices from Schneider &

Page 84

1      Sherman memorializing the foreclosure sale by

2      publication of the subject property.

3  Q.  All right.  On the first page there, this looks

4      like it's a communication to the Berrien County

5      sheriff's office from Schneiderman & Sherman,

6      right?

7  A.  Yes.

8  Q.  And if we didn't cover this before, I want to

9      make sure it's clear.  Schneiderman & Sherman was

10      the law office engaged by CMS to conduct the

11      foreclosure on the Macholtzs' property, right?

12  A.  That's my knowledge.

13  Q.  It says in the body, Enclosed please find a sale

14      package for Thursday, October 11, 2018, for the

15      above-referenced matter.  Please contact Anna

16      Graham at Detroit Legal News, provides a phone

17      number, should a third party bid at the sale, and

18      then it says the opening bid amount is $150,000,

19      right?

20  A.  Correct.

21  Q.  That indicates that the bid amount authorized by

22      CMS was less than what CMS claimed the indebted

23      to be, right?

24  A.  Yes.

25  Q.  Do you know if the Schneiderman law firm placed

Page 85

1      that $150,000 bid at the sheriff sale?

2           MS. LAPIN:  I'm just going to object,

3      because that document doesn't address the sheriff

4      sale.

5           MR. WESTBROOK:  I'm just asking if he

6      knows.  If he doesn't know, we can move on.

7           THE WITNESS:  I don't know.

8  BY MR. WESTBROOK:

9  Q.  Do you recall reviewing the sheriff deed that was

10      generated on October 11, 2018?

11  A.  The one contained within Exhibit 11?

12  Q.  No.  I don't think that one is executed, is it?

13           MS. LAPIN:  Right, it's not.

14  BY MR. WESTBROOK:

15  Q.  I can make the representation to you, though,

16      that there is an executed version of this

17      document.  With that assumption in mind, that

18      would seem to confirm that the bid of $150,000

19      was made, right?

20  A.  Yes.

21  Q.  I'm not leading you astray on this.  That's what

22      it was.

23          So your counsel has just shown you an

24      executed version of that sheriff's deed, right?

25  A.  Correct.

Page 86

1  Q.  Reflecting the $150,000 successful bid, right?
2  A.  Yes.
3  Q.  And that's refreshed your memory that that bid
4      was made and ultimately was successful, right?
5  A.  Yes.
6  Q.  If the successful bid of the sheriff sale was
7      $150,000 on October 11, 2018, the redemption
8      amount would not be $278,457.17, would it?
9          MS. LAPIN:  Can I ask, form,
10     foundation, calls for speculation.  That would
11     involve you having to do calculations right now?
12         THE WITNESS:  I don't know.
13 BY MR. WESTBROOK:
14 Q.  Is it your understanding that the redemption
15     amount would be the successful bid amount
16     $150,000, plus interest and maybe a small amount,
17     three figures, of costs, right?
18         MS. LAPIN:  I'm just going to object.
19         MR. WESTBROOK:  I'm asking what his
20     understanding is.
21         MS. LAPIN:  Yeah.  Yeah.
22         THE WITNESS:  I don't know.
23 BY MR. WESTBROOK:
24 Q.  Do you know if as of February of 2018 the
25     redemption amount for the property was the same

Page 87

1      as the payoff amount for the loan?
2          MS. LAPIN:  Asked and answered.  Same
3      objection.
4          MR. WESTBROOK:  I haven't asked that
5      question before.
6          MS. LAPIN:  I thought you did.
7          THE WITNESS:  Can you repeat the
8      question?
9          MR. WESTBROOK:  Let me rephrase.
10 BY MR. WESTBROOK:
11 Q.  Do you know if it was correct as of February of
12     2019 that the redemption amount for the property
13     was the same as the payoff amount with the loan?
14 A.  I don't know.
15         (Exhibit 12 marked.)
16 BY MR. WESTBROOK:
17 Q.  I've just handed you what we marked Exhibit 12.
18     It's a letter that's bears the date of June 15,
19     2018.  Is that right?
20 A.  Yes.
21 Q.  Appears to be addressed to Carrington Mortgage
22     Services, LLC, right?
23 A.  Yes.
24         MS. LAPIN:  Guys, can we go off record
25     one second?

Page 88

1          (Off the record.)
2  BY MR. WESTBROOK:
3  Q.  So when we broke, we had just started looking at
4      this document Exhibit 12?
5  A.  Yes.
6  Q.  What I wanted to ask you was the address -- so
7      there's an address block at the top Carrington
8      Mortgage Services, obviously, but then the
9      address is a P. O. box, P. O. Box 5001,
10     Westfield, Indiana  46074.  Do you see that?
11 A.  Yes.
12 Q.  Do you know if that's the correct address for
13     borrowers to send requests for information to
14     CMS?
15 A.  Yes.  To my knowledge, that is the correct
16     address.
17 Q.  Do you know if CMS received this letter?
18 A.  I don't know.  I would assume so.  It seems to be
19     correctly addressed, but I don't know.
20         MS. LAPIN:  If you don't know, you
21     don't know.
22         THE WITNESS:  I don't know.
23         MS. LAPIN:  Don't assume.
24 BY MR. WESTBROOK:
25 Q.  We'll see another document.  I'll just give you a

Page 89

1      preview.  There's another document where CMS
2      acknowledges receipt of it.  So I'll just ask you
3      to assume it was received for the time being.
4          Now, as of the date of the letter, June
5      15, 2018, CMS was servicing Anthony Macholtz's
6      loan, right?
7  A.  Yes.
8  Q.  Now, there's some front matter that talks about
9      the mortgage that's at issue, but what I want to
10     talk about is underneath that there's a heading,
11     "Request for Information."  Do you see that?
12 A.  Yes.
13 Q.  It starts, "My client hereby requests the
14     following servicing information regarding the
15     loan," and then there's a list of ten types of
16     items, right?
17 A.  Correct.
18 Q.  I want to focus in on just a few of those.  No. 3
19     it says, "Copies of all statements regarding the
20     loan from its inception to date."  Do you see
21     that?
22 A.  Yes.
23 Q.  Then No. 4, Copies of all servicing notes
24     regarding the loan from its inception to the
25     date."  Do you see that?

1  A.    Yes.

2  Q.    No. 6 says complete account history for the loan

3         showing dates and amounts of payments, credits,

4         debits, fees, and principal and interest amounts.

5         Did I read that correctly?

6  A.    Yes.

7  Q.    Then on to No. 9 on the following page, it says,

8         "Copies of any and all documents evidencing

9         assignments of indebtedness, mortgage rights,

10        servicing rights, or any other rights with

11        respect to the loan from its inception to date."

12        Do you see that?

13  A.   Yes.

14  Q.   I'm going to sort of back up.  Does CMS have

15        procedures in place for responding to borrower

16        requests for information?

17            MS. LAPIN:  Same objection.  Just

18        general objection for form, foundation, for

19        perhaps seeking proprietary information regarding

20        policies and procedures.

21            MR. WESTBROOK:  I want to clarify the

22        question too and I'm sure you'll say same

23        objection.

24            MS. LAPIN:  I'll say same objection,

25        but go ahead.

1  A.    I would think that a borrower could expect to

2         receive monthly statements upon request.

3  Q.    All right.  But do you know if CMS's procedures

4         talk about that specifically?

5  A.    I don't know.

6  Q.    Do you know if CMS's procedures for responding to

7         borrower, written borrower requests for

8         information, discuss whether borrowers are

9         entitled to receive servicing assignment notices?

10  A.   I don't know.

11  Q.   Have you seen any written documents that call

12        themselves a policy or procedure regarding

13        responding to borrower written requests for

14        information?

15            MS. LAPIN:  Same objection.

16            THE WITNESS:  I don't recall seeing any

17        policies or procedures with respect to that.

18  BY MR. WESTBROOK:

19  Q.   Have you had occasion to look for such a written

20        policy or procedure document at CMS?

21            MS. LAPIN:  Same objection.  Yeah, same

22        objection.

23            THE WITNESS:  Not to my knowledge.

24  BY MR. WESTBROOK:

25  Q.   During the June-July of 2018 time frame whether

1            MR. WESTBROOK:  I want to clarify.

2  BY MR. WESTBROOK:

3  Q.    Does CMS have procedures in place for responding

4         to written requests by borrowers for servicing

5         information about their loans?

6            MS. LAPIN:  Same objection.

7            THE WITNESS:  Yes.

8  BY MR. WESTBROOK:

9  Q.    Do those procedures discuss whether borrowers are

10        entitled to receive past statements on their loan

11        accounts?

12            MS. LAPIN:  Same objection.

13            THE WITNESS:  I don't know.

14  BY MR. WESTBROOK:

15  Q.   Do you know if those procedures discuss whether

16        borrowers are entitled to receive servicing notes

17        with respect to their loan?

18            MS. LAPIN:  The first one you said was

19        loan statements?  That was your first one?

20            MR. WESTBROOK:  Yes.

21  BY MR. WESTBROOK:

22  Q.   By loan statement, I'm referring to periodic loan

23        statements that you didn't expect to receive on a

24        monthly basis.  Does that change your answer at

25        all regarding procedures?

1         CMS had a standard practice of not providing past

2         statements to borrowers who request them in

3         writing?

4            MS. LAPIN:  Same objection.

5            THE WITNESS:  I'm not aware of such a

6         policy and procedure.

7            MS. LAPIN:  I'm sorry, Ted.  You asked

8         are you aware of a policy that tells them not to

9         provide something?

10            MR. WESTBROOK:  That was the last

11        question, yes.

12            MS. LAPIN:  Correct.  And what was that

13        item or the issue?

14            MR. WESTBROOK:  Periodic statements.

15  BY MR. WESTBROOK:

16  Q.   Are you aware during that same time frame June

17        July 2018 of any CMS standard practice of not

18        providing servicing notes to borrowers who

19        request them in writing?

20            MS. LAPIN:  Same objection.

21            THE WITNESS:  I'm not aware of that.

22  BY MR. WESTBROOK:

23  Q.   Do you know if CMS responded to the letter

24        represented in Exhibit 12?

25  A.   No, I don't know.

Page 94

1        (Exhibit 13 marked.)
2    BY MR. WESTBROOK:
3    Q.    I'm handing you what I just marked Exhibit 13,
4          the first page at least reflects Carrington's
5          letterhead, right?
6    A.    Yes.
7    Q.    And this document looks like it's dated
8          July 25th, 2018, right?
9    A.    Correct.
10   Q.    And dated to my office Westbrook Law, PLLC,
11         right?
12   A.    Yes.
13   Q.    Concerning the property that's at issue in the
14         case, 1886 Russell Road, Baroda, Michigan, right?
15   A.    Yes.
16   Q.    Is this a document you've reviewed before?
17   A.    Yes.  You just actually refreshed my memory.  I
18         did see this in response to this letter.
19   Q.    I thought it might.
20   A.    Seeing that many documents, they all become a
21         blur.
22   Q.    Would you agree with me that this document seems
23         to be a response by CMS to the letter reflected
24         in Exhibit 12?
25   A.    Yes, I do.

Page 95

1    Q.    Now, I'd ask you to just briefly flip through it
2          to gain an understanding of the types of
3          information that's attached to the letter.
4          You've briefly had a chance to familiarize
5          yourself with the document, right?
6    A.    Yes.
7    Q.    Is it fair to characterize this set of
8          information here as a letter from Carrington
9          followed by what seems to be documents associated
10         with the property?
11   A.    Yes.
12   Q.    Do you have any reason to disagree with me that
13         this contains CMS's response to the Exhibit 12
14         request for information?
15   A.    I agree.
16            MS. LAPIN:  I'm just going to say,
17         though, I don't think it's the one that --
18         without going with a fine-tooth comb, I know
19         that -- I'm not sure if -- I know I attached one
20         to my motion for judgment on the pleadings.  I'm
21         not sure if it's the exact same version.
22            MR. WESTBROOK:  Then that's fine.  I'll
23         represent though --
24            MS. LAPIN:  I just double-checked it.
25         It looks like it's close enough.

Page 96

1    BY MR. WESTBROOK:
2    Q.    So, obviously, I don't expect you to know whether
3          there are, you know, a missing page here and
4          there.  I'm asking more generally about the
5          document, if it appears to be, you know, the set
6          of information that was given by CMS in response
7          to Exhibit 12.
8    A.    Right.
9    Q.    Now, as you flipped through there, and feel free
10         to flip through it as much as you need to or want
11         to, but as you flip through there, did you see in
12         this stack of documents any periodic account
13         statements?
14   A.    What I'm seeing, I'm not seeing any actual
15         accounting statements.
16   Q.    In that stack that's Exhibit 13, is any part of
17         the servicing notes history included?
18   A.    I didn't see it.
19   Q.    All right.  Did you see any servicing notes or
20         collection notes?
21   A.    I didn't see any service nor collection notes.
22         There is a copy of the transaction history.
23   Q.    Right.  And I wish I would have numbered these
24         pages now, but I think you and I are looking at
25         the same page there.  It's dated July 26 of 2018,

Page 97

1          right?
2    A.    Yes.
3    Q.    And I think you had discussed this form of
4          document before when we were talking about the
5          servicing notes that are reflected in Exhibit A,
6          right?
7                But what we're looking at inside of
8          Exhibit 13 is it bears some similarity in how it
9          looks to Exhibit 8, but it's actually a different
10         type of document, right?
11   A.    Correct.
12   Q.    And so what type of information is reflected in
13         this page that we're looking at within Exhibit
14         13?
15   A.    This would be financial transactions.
16   Q.    And just summarizing what this appears to show in
17         the columns, appears to be some disbursements
18         maybe for taxes and/or insurance.  Is that fair?
19   A.    Yes.
20   Q.    And appears maybe some charges as well for small
21         amounts, several $15 charges, a few $20 charges,
22         right?
23   A.    Yes.
24   Q.    Do you know if those represent inspection fees?
25   A.    Typically, yeah, from my experience, an

Page 98

1    inspection fee is around that amount.
2         MS. LAPIN:  But just to be clear,
3    you're not -- for this particular situation,
4    that's all.
5         MR. WESTBROOK:  Right.  We don't need
6    to get into great detail on it.  I'm just trying
7    to confirm what I understand.
8         MS. LAPIN:  That's definitely
9    understood.
10   BY MR. WESTBROOK:
11   Q.   Did you see within this stack that's Exhibit 13
12        any notice of a servicing transfer to CMS?  Just
13        to be clear, I think there may be a document
14        purporting to be one from CitiMortgage in here.
15             My question, though, I'm going to limit
16        it now, is there such a document notice of
17        servicing transfer from CMS in this stack?
18             MS. LAPIN:  In this stack, right.
19             MR. WESTBROOK:  In this stack.  My
20   understanding is there isn't one in this stack
21   just so you know where I'm coming from.
22             THE WITNESS:  That's my understanding
23   too.
24             MS. LAPIN:  Take your time.
25             MR. WESTBROOK:  It's possible that's

Page 99

1    not in the stack either and it's somewhere else.
2         MS. LAPIN:  That's fine.  Or maybe it's
3    in a later one, something like that.
4         MR. WESTBROOK:  It very well could be.
5         THE WITNESS:  No, I'm not seeing that.
6    BY MR. WESTBROOK:
7    Q.   CMS does maintain that it sent Anthony Macholtz a
8        notice of servicing change-back in January of
9        2017, right?
10   A.   I don't know.
11   Q.   Do you recall reviewing any notices of servicing
12        transfer with respect to this loan?
13   A.   Possibly.  There are that many documents.  I
14        can't recall whether I saw this document.
15   Q.   That's fair.
16             Is it fair to say that CMS
17        intentionally did not provide periodic account
18        statements, servicing notes, and notices of
19        servicing transfer in response to the request for
20        information at Exhibit 12?
21             MS. LAPIN:  Objection.  Form,
22   foundation, calls for speculation.
23             THE WITNESS:  I have no reason to
24   believe that Carrington would have withheld
25   information.

Page 100

1    BY MR. WESTBROOK:
2    Q.   Let's look at the second page of Exhibit 13.  I'm
3        looking at the first page.  It says, "With regard
4        to your request for protected documents,
5        Carrington states that documents requested, if
6        they exist, may be proprietary, confidential,
7        and/or otherwise protected from disclosure and
8        dissemination.  Therefore, we are unable to
9        provide you with copies of collection notes,
10       collection records, communication files, or any
11       other form of recorded data between CMS and the
12       borrower, copies of servicing agreements,
13       contracts, property inspections, invoices, and
14       procedural manuals, et cetera."  Do you see that?
15   A.   Yes.
16   Q.   Is there any other way to interpret that
17        communication from CMS then that they are
18        refusing to provide periodic statements,
19        collection notes, and so forth?
20             MS. LAPIN:  I just object.  Form,
21   foundation, and the other thing is too, I'll just
22   say because --
23             MR. WESTBROOK:  I want him to answer
24   the question.
25             MS. LAPIN:  I was just going to say,

Page 101

1    too, I think you're almost seeking a legal
2    conclusion as well, because I think the
3    interpretation and the contents of these letters
4    are going to be governed by statute.
5         MR. WESTBROOK:  Okay.
6    BY MR. WESTBROOK:
7    Q.   Let me ask it this way.  Did it seem from the
8        language used in the paragraph that I've read
9        that CMS decided not to produce certain documents
10       that were requested?
11            MS. LAPIN:  Same -- yeah, same.  Form
12   and foundation and with that word "decided."
13            THE WITNESS:  I don't know.
14   BY MR. WESTBROOK:
15   Q.   Do you have an understanding of what makes
16        periodic account statements protected documents
17        as they are described here?
18   A.   No.
19   Q.   Are account statements considered confidential or
20        proprietary to CMS?
21            MS. LAPIN:  Form, foundation, calls for
22   speculation.
23            THE WITNESS:  Can you repeat the
24   question, please?
25   BY MR. WESTBROOK:

Page 102

1  Q.  Are periodic account statements considered
2      confidential or proprietary within CMS?
3              MS. LAPIN:  I'm also going to object
4      that I don't know that the failure to have
5      periodic statements is specifically referenced in
6      that paragraph.  My objection is the letter
7      speaks for itself.
8              THE WITNESS:  I don't know.
9  BY MR. WESTBROOK:
10 Q.  Do you know if CMS ever sent periodic statements
11     regarding the loan to Mr. Macholtz until -- or
12     prior to June of 2018?  Sorry, that was clumsy.
13     Let me ask it again.
14              Do you know if CMS ever sent periodic
15     loan statements to Anthony Macholtz before June
16     of 2018, so before they were requested in the
17     letter?
18 A.  I don't know.
19 Q.  Did CMS's file for the loan have in it
20     CitiMortgage statements, periodic CitiMortgage
21     statements?
22 A.  To my knowledge, yes.
23 Q.  Those statements, the CitiMortgage statements to
24     Mr. Macholtz, would have indicated that they had
25     been sent to him, right?

Page 103

1              MS. LAPIN:  Objection.  Form and
2      foundation.  Documents speak for themselves.
3              THE WITNESS:  Not fully understanding
4      the question.
5  BY MR. WESTBROOK:
6  Q.  Did you review any of the CitiMortgage periodic
7      statements regarding this loan?
8  A.  Yes.
9  Q.  Do you know if they had Mr. Macholtz's name on
10     them?
11 A.  Yes.
12 Q.  Do you know if they had an address, a mailing
13     address for him?
14 A.  Yes.
15 Q.  Do you know of any reason why it would be
16     problematic for CMS to provide those CitiMortgage
17     periodic statements upon his written request for
18     them?
19 A.  I don't know.
20              MS. LAPIN:  Same objection.
21 BY MR. WESTBROOK:
22 Q.  Do you know of any reason why servicing notes,
23     like the servicing notes history document we
24     looked at in Exhibit 8, would be considered
25     protected documents by CMS?

Page 104

1              MS. LAPIN:  Same objection.
2              THE WITNESS:  I don't know.
3  BY MR. WESTBROOK:
4  Q.  Do you know if in response to Exhibit 12 if any
5      research was done within CMS regarding whether
6      the requested documents were confidential and
7      proprietary?
8  A.  I don't know.
9  Q.  Do you know of any policy or procedure in place
10     at CMS to do research regarding whether documents
11     requested by borrowers in writing are
12     confidential and proprietary?
13              MS. LAPIN:  Same objection.
14              THE WITNESS:  I'm not aware.
15 BY MR. WESTBROOK:
16 Q.  Do you know if in response to Exhibit 12 if there
17     was any attempt made within CMS to locate or
18     review account statements for the loan?
19 A.  I don't know.
20 Q.  Do you know if in response to Exhibit 12 an
21     attempt was made within CMS to note the servicing
22     note?
23 A.  I don't know.
24 Q.  Apart from what you see here in Exhibit 13, are
25     you aware of any other responses by CMS to

Page 105

1      Exhibit 12?
2  A.  I'm not aware.
3              (Exhibit 14 marked.)
4  BY MR. WESTBROOK:
5  Q.  I'm handing you what I just marked Exhibit 14,
6      which, again, it's on my firm's letterhead and
7      bears the date of April 24, 2018.  Do you see
8      that?
9  A.  Yes.
10 Q.  Appears to reflect the same mailing address that
11     we saw on Exhibit 12, right?  Carrington Mortgage
12     Services, P.O. Box 5001, Westfield, Indiana,
13     46074, right?
14 A.  Correct.
15 Q.  Is this a document that you had a chance to
16     review prior to your deposition today?
17 A.  Yes.
18 Q.  Do you have an understanding what this is?
19 A.  Do you mind if I refresh my memory by reading it?
20 Q.  Please do.
21 A.  Yes.
22 Q.  What's your understanding of what the document
23     is?
24 A.  This is a document on Westbrook Law on behalf of
25     Anthony Macholtz.  Identify what the alleged

Page 106

```
 1    notice of error regarding a breach letter from
 2    what I can understand.
 3 Q. Now, the letter talks briefly at the bottom of
 4    the top page that you see there.  It talks about
 5    a communication August 19, 2018, posting,
 6    foreclosure posting.  Do you see that?  It's the
 7    beginning of the bottom paragraph.
 8 A. Yes.
 9 Q. And that's a true statement, isn't it?  I'll read
10    it for you.
11           "On or about August 19, 2018,
12    Carrington, through its attorneys, Schneiderman &
13    Sherman, posted to Mr. Macholtz's property a
14    foreclosure notice specifying a sheriff sale date
15    of September 6, 2018."
16           MS. LAPIN:  I'm just going to object on
17    the characterization of a true statement.  Form
18    and foundation.  He didn't write the letter, so
19    ...
20 BY MR. WESTBROOK:
21 Q. Do you have any reason to dispute that that's
22    true, that sentence?
23 A. I don't know.  I didn't play any part in this.
24 Q. Right, but, you know, we've looked at documents
25    earlier.  The document dated August 19 on
```

Page 107

```
 1    Schneiderman letterhead, right?
 2           MS. LAPIN:  Then there was just the
 3    bidding, so I think it's just what, Exhibit 10?
 4           MR. WESTBROOK:  We'll move on, but I'll
 5    make it more general.  I'll make it more general
 6    and this will be easier.
 7 BY MR. WESTBROOK:
 8 Q. Is it your understanding that the Schneiderman
 9    letterhead on CMS's behalf did do a foreclosure
10    posting regarding the property?
11 A. Yes.
12 Q. Above that sentence we just read and talked
13    about, there's discussion of an alleged
14    requirement and mortgage for some kind of notice.
15    Is that a fair characterization?
16 A. Yes.
17 Q. Now, I understand CMS doesn't think it violated
18    any provision of the mortgage.  Fair to say?
19 A. Yes.
20 Q. Is it CMS's position that CMS provided 30 days'
21    written notice an opportunity to cure prior to
22    initiating foreclosure with respect to this home?
23           MS. LAPIN:  I am just going to say
24    there are pleadings, yes, speak for themselves on
25    that point.
```

Page 108

```
 1           THE WITNESS:  That is Carrington's
 2    business practice.
 3 BY MR. WESTBROOK:
 4 Q. Have you seen a notice CMS sent to Mr. Macholtz
 5    of a right to cure that's dated at least 30 days
 6    prior to initiating foreclosure?
 7 A. I may have seen one in my review of the
 8    documents, but there were that many documents, so
 9    I can't recall whether I saw that individual
10    document.
11 Q. If you have seen such a document, would it have
12    been on Carrington letterhead, on CMS letterhead?
13           MS. LAPIN:  I'm just going to object.
14    I know it's hard because he -- there have been
15    pleadings filed in this case including the
16    dispositive motion, which addresses these issues,
17    so I'm just going to say that regardless of
18    possibly his knowledge, I think Carrington's
19    position on that particular issue and supporting
20    documents have been made part of the record.
21    That's all I can say.
22 BY MR. WESTBROOK:
23 Q. We're here to try and get CMS's knowledge on
24    these things to the extent that it's reasonably
25    possible for you to know them, which is why
```

Page 109

```
 1    you're here.  And I'd just say that as a prelude
 2    to this question, which is, do you recall seeing
 3    a notice drafted by CMS of a right-to-cure
 4    default on the mortgage loan that's dated at
 5    least 30 days prior to the initiation of
 6    foreclosure?
 7 A. Again, I reviewed that many documents.  I don't
 8    recall whether I saw the document to which you're
 9    referring.
10 Q. Do you know if CMS sent a notice to Mr. Macholtz
11    of a right to cure after initiating foreclosure
12    process?
13           MS. LAPIN:  Same objection.
14           THE WITNESS:  Same answer.  I saw that
15    many documents.  I'm not aware of whether I saw
16    or didn't see such a document.
17 BY MR. WESTBROOK:
18 Q. I'm just trying to get us on the same page on
19    dates with this question.
20           Exhibit 10 we looked at.  That's one of
21    the Schneiderman documents.  It says, "Notice of
22    sale and pending foreclosure."  It's dated
23    August 9 of 2018.  Are you with me so far?
24 A. Yes.
25 Q. So would you agree with me that we can tell the
```

1    foreclosure process had begun by August 9, 2018?
2          MS. LAPIN:  I'll just -- only objection
3    is the document speaks for itself.
4          THE WITNESS:  Yes.
5          (Exhibit 15 marked.)
6    BY MR. WESTBROOK:
7    Q.   I'm handing you what has been marked as
8    Exhibit 15.  Have you had a chance to glance what
9    the Exhibit 15 contains?
10   A.   Yes.
11   Q.   All right.  And it's fair to say that the top
12   document, the first few pages seems to be a
13   letter on Carrington letterhead dated October 8
14   of 2018?
15   A.   Correct.
16   Q.   I'm going to read the first line of the body.  It
17   says, "This letter is in response to a written
18   inquiry received in our office on August 27,
19   2018."  Did I read that right?
20   A.   Yes.
21   Q.   Does it appear to you that Exhibit 15, at least
22   the letter is, was sent by CMS in response to
23   Exhibit 14?
24   A.   Yes.
25   Q.   If you would flip past the body of the letter and

1    then past all the disclosures, the very next page
2    has in bold letters near the top the words,
3    "Account Reinstatement Notification."  Do you see
4    that?
5    A.   I do.
6    Q.   There's a date at the very -- near the very top,
7    it says, "Notice date, 10/9/18."  Do you see
8    that?
9    A.   Yes.
10   Q.   And reading just the beginning of the body, it
11   says, "Carrington Mortgage Services, LLC,
12   prepared this notification based on the request
13   made by you or on your behalf to reinstate your
14   loan and cure the delinquent and outstanding
15   balances owed under your current note.  You must
16   remit total payment of $166,920.97."  Do you see
17   that?
18   A.   Yes.
19   Q.   Is it consistent with your understanding that
20   this notification document was included with the
21   letter that forms the first few pages of Exhibit
22   15?
23   A.   Yes, to my knowledge.
24   Q.   Do you know if this document was transmitted
25   directly or indirectly to Mr. Macholtz?

1    A.   It bears the address of 6140 28th Street, which
2    is Westbrook Law's address.
3    Q.   Right, his counsel?
4    A.   Yes.
5          MS. LAPIN:  The guy you're talking to
6    right now.
7          THE WITNESS:  Exactly.
8          MR. WESTBROOK:  Correct.  I'm not
9    trying to trip you up on that.
10   BY MR. WESTBROOK:
11   Q.   Do you know if this was or if it would have been
12   transmitted by mail or by some other means?
13   A.   Typically by mail.
14   Q.   Do you know what date it was mailed on?
15   A.   I would say on or about October 8, 2018.
16   Q.   I see that date on the first page of Exhibit 15,
17   but then on the account reinstatement
18   notification portion it has a date of October 9
19   of 2018.
20   A.   Correct.
21   Q.   Do you know if the notice date reflects the date
22   that it was created?
23   A.   That would have been my understanding.
24          MS. LAPIN:  Can I just clarify one
25   thing?  I just wanted to be clear.  Did you ask

1    him if this was included in it?  Because when you
2    look at the second paragraph from the bottom, the
3    reinstatement, I thought, was submitted
4    differently.  That was my understanding.
5          MR. WESTBROOK:  I think it will be
6    cleared up when I ask him about the next
7    document, but I'll just --
8          MS. LAPIN:  That's fine.
9          MR. WESTBROOK:  It was included in what
10   I received, yes.  There's a separate one too.
11   BY MR. WESTBROOK:
12   Q.   Moving on from that account reinstatement
13   notification, seems to be a two-page document
14   with some disclosures that after it, and then a
15   document on CitiMortgage letterhead, right?
16   A.   Yes.
17   Q.   And then flipping a couple of additional pages,
18   there's now another document that has a
19   Carrington logo on the upper right.  It's
20   entitled, "Request for Mortgage Assistance."
21   A.   Right, yes.
22   Q.   All right.  And a request for mortgage assistance
23   packet is referenced in the letter, and that's
24   the top page of Exhibit 15.  It says, "Lastly, a
25   request for mortgage assistance, RMA, packet is

Page 114

1    enclosed per your request, right?

2  A.  Yes.

3  Q.  So is it your understanding then that the package
4      that starts with this header "Request for
5      Mortgage Assistance" is that same thing that's
6      referred to in the letter?

7  A.  Yes.

8  Q.  As a general matter, a request for mortgage
9      assistance is a document through which a borrower
10     may be able to request a loan modification from
11     CMS, right?

12 A.  Or the mortgage assistance as deemed applicable.
13     It's not always a modification.

14 Q.  I see.  There are other ways that mortgage
15     assistance could potentially be provided, right?

16 A.  Yes.

17 Q.  Do you have an understanding of why this request
18     for mortgage assistance package or application
19     was included with this response by CMS?

20 A.  Yeah, it was requested on page 2 of Exhibit 14.

21 Q.  Do you have an understanding of whether CMS
22     intended to evaluate any requests for mortgage
23     assistance application from Anthony Macholtz as
24     of this date October 8 or 9 of 2018?

25 A.  I don't know.

Page 115

1  Q.  Are you aware of a uniform policy within CMS of
2      rejecting requests for mortgage assistance
3      applications if CMS receives them less than 37
4      days before a foreclosure sale?

5          MS. LAPIN:  Objection.  Form,
6      foundation, calls for speculation, possibly
7      proprietary information.  I think it seeks a
8      legal conclusion too based on federal statute.

9          THE WITNESS:  I don't know.

10 BY MR. WESTBROOK:

11 Q.  Do you recall from either reviewing the documents
12     before the deposition or from the exhibits that
13     we've looked at today that the sheriff sale for
14     the Macholtzs' property was held on October 11 of
15     2018?

16         MS. LAPIN:  I'm sorry, Ted, can you
17     repeat that again?

18         MR. WESTBROOK:  I'm asking for
19     confirmation if the sheriff sale was October 11
20     of 2018.

21         MS. LAPIN:  I don't want -- if you need
22     to see the sheriff deed, I'll show it to you if
23     you need that.  I don't know if you have that
24     date committed to memory.

25         THE WITNESS:  Can I see the sheriff's

Page 116

1      deed?

2          MR. WESTBROOK:  If you have it handy,
3      that would be terrific.

4          THE WITNESS:  October 11 is correct.

5  BY MR. WESTBROOK:

6  Q.  And that's consistent with what's stated on the
7      account reinstatement notification which says
8      your property has a scheduled foreclosure sale on
9      10/11/2018.

10 A.  Correct.

11 Q.  I'll ask you to quickly turn to Exhibit 8, which
12     is the servicing notes history.  The specific
13     page I'd like you to flip to is numbered 74.

14         Just by way of background, are you
15     aware of whether Mr. Macholtz sent in a completed
16     request for mortgage assistance?

17 A.  I'm not aware.

18 Q.  I'd ask you then to turn back one page to the one
19     that's numbered 73.  The bottom of the page is
20     dated November 16, 2018.  The T number 8042,
21     there's a notation there in the notes, "New
22     hardship package received."  Do you see that?

23 A.  Yes.

24 Q.  Is that consistent with the borrower having
25     submitted a request for mortgage assistance?

Page 117

1  A.  Yes.

2  Q.  Now, the following page numbered 74, the fourth
3      entry down, it's dated November 19, 2018, T
4      number 3553.  Looking at the entry that says,
5      "Docs sent to 2L for denial due to FCL sale held
6      10/11/18."

7  A.  Yes.

8  Q.  Do you know what 2L stands for?

9  A.  It's my understanding that 2L stands for, like, a
10     second look, like a second look at the documents.

11 Q.  An FCL sale would mean foreclosure sale, right?

12 A.  Yes.

13 Q.  And consistent with what you just told me, second
14     look, another couple of entries down, T number
15     7623, it says, "Second look review completed.
16     Verified.  FC sale held.  Date in tempo,
17     10/11/18.  Sale held.  Property is with the sale.
18     Package denied and doc send to imaging.  Is that
19     right?  Did I read it right?

20 A.  Yes.

21 Q.  So did that indicate to you when you look at it
22     that some other person besides T 3553 reviewed
23     the package?

24 A.  Yes.

25 Q.  The next line down, it says, "LM closed.

Page 118

1  Intake-foreclosure sale within 37 days," right?
2  A.  Yes.
3  Q.  Do you know what that means?
4  A.  Literally, I would understand it to be what it
5      says.  Lost mitigation closed.
6      Intake-foreclosure sale within 37 days.
7  Q.  Does that indicate the reason for the denial of
8      the lost mitigation application?
9  A.  That's how I understand it.
10 Q.  Do you know if at the time that CMS sent a
11     request for mortgage assistance application to
12     Mr. Macholtz through his attorney whether CMS
13     intended to review the application once he
14     submitted it to them?
15 A.  I don't know.
16 Q.  Is there any other person who would know the
17     answer to that question at CMS?
18 A.  Possibly someone within our underwriting
19     department.
20 Q.  Any particular person that you know of?
21 A.  No.  No one that I can bring to mind.
22 Q.  Any particular job title that you know of?
23 A.  No.
24 Q.  If you were trying to find an answer to that
25     question whether anyone intended to review the

Page 119

1      package once it was submitted, how would you find
2      that out?
3          MS. LAPIN:  I'm just going to object
4      because -- on the form of the question.  I think
5      the way you're asking it is you're assuming that
6      no one intended to review it.
7          MR. WESTBROOK:  That's the question I'm
8      asking.
9  BY MR. WESTBROOK:
10 Q.  If you want to find out whether that was the case
11     or not, how would you find out?
12 A.  I would reach out to a supervisor in our
13     underwriting department.
14         (Exhibit 16 marked.)
15 BY MR. WESTBROOK:
16 Q.  Handing you what's been marked Exhibit 16.  The
17     first page of Exhibit 16 is a fax cover sheet.
18     It references my law firm, and I'll represent to
19     you that the fax number there is the fax number
20     that goes to my law firm's fax machine.  But I'd
21     like you to look at the following page.  It's
22     entitled, "Payoff Statement," right?
23 A.  Yes.
24 Q.  Dated October 9, 2018, right?
25 A.  Yes.  Dated October 9, 2018.

Page 120

1  Q.  Is this a document that you had a chance to
2      review prior to the deposition today?
3  A.  May well have been a document I reviewed, but the
4      documents were so numerous, I can't recall this
5      individual document.
6  Q.  What's the payoff amount that's reflected in the
7      document?
8  A.  The total amount to pay the loan in full was
9      $284,597.40.
10 Q.  Do you have any reason to dispute that this is a
11     payoff statement that CMS prepared and sent to
12     Mr. Macholtz's counsel?
13 A.  No.
14 Q.  Now, are you aware that there were some written
15     discovery activity in the case in this particular
16     lawsuit?
17 A.  Could you elaborate?
18 Q.  There were requests for documents and those sorts
19     of things back and forth between the parties?
20 A.  Within the exhibits that have already been
21     presented?
22 Q.  Not within the exhibits, within the lawsuit.
23 A.  I'm not too sure.
24 Q.  Did you review any discovery instruments like
25     requests for admission, requests for production

Page 121

1      of documents, so forth, in preparation for
2      today's deposition?
3  A.  I can't recall.
4  Q.  I think you testified before that you weren't
5      personally involved in finding documents to
6      produce in connection with written discovery in
7      the case, correct?
8  A.  That's correct.
9  Q.  Do you know who at CMS did have involvement in
10     that?
11 A.  No.
12         (Exhibit 17 marked.)
13 BY MR. WESTBROOK:
14 Q.  I'm handing you what I marked as Exhibit 17.
15     Exhibit 17 has the case caption for the present
16     lawsuit and is entitled, "Defendants'
17     Supplemental Responses to Plaintiff's Request for
18     Admission."  Do you see that?
19 A.  Yes.
20 Q.  Did you take any part in formulating CMS's
21     response represented by this Exhibit 17?
22 A.  No.
23 Q.  With that understanding, I'm going to ask you
24     about the supplement response that's on page 4 of
25     the document.  It's under the heading,

Page 122

1    "Supplemental Response," and it says, "Admit that
2    at least one piece of correspondence you
3    attempted to mail to plaintiff at P.O. Box 287,
4    Baroda, Michigan, 49101-0287, was returned to you
5    undeliverable."  Did I read that correctly?
6  A.    Yes.
7  Q.    And then under the answer portion admit or deny,
8    it says, "Defendants cannot admit or deny the
9    allegations.  CMS's records indicate that mail
10    was returned as undeliverable on June 28, 2017;
11    July 13, 2017; and July 31, 2017."  Do you see
12    that?
13  A.    Yes.
14  Q.    Have you reviewed any records at any time within
15    CMS that indicate that mail sent by CMS to
16    Mr. Macholtz was returned to CMS undelivered?
17  A.    I'm trying to recall.  I can't remember.
18    Honestly can't remember.
19        MS. LAPIN:  Whether you saw this or
20    not?
21        THE WITNESS:  Yes.
22  BY MR. WESTBROOK:
23  Q.    Do you have an understanding of whether CMS's
24    records do indicate that mail was returned to CMS
25    undeliverable?

Page 123

1  A.    I don't know.
2  Q.    Do you know if anyone at CMS attempted to
3    investigate which pieces of mail may have been
4    returned to CMS undeliverable?
5  A.    I don't know.
6  Q.    If you were trying to investigate and discover
7    whether certain documents were returned to CMS
8    undeliverable, what would you do?
9  A.    I'd look into our document system of records to
10    see if there's any indication of mail being
11    returned to us and also check the notation
12    system.
13  Q.    The notation system, would that be in the form of
14    Exhibit 8?
15  A.    Looks like it, yes.
16  Q.    Do you know if a notation would ordinarily be
17    placed into the servicing notes history if mail
18    were returned to CMS undeliverable to reach a
19    certain account?
20  A.    To the best of my knowledge, yes.
21  Q.    Is there any other system that you would look in
22    aside from the one reflected at Exhibit 8?
23  A.    Let's go back to Exhibit 8 and refresh what that
24    exhibit is.  Yeah, I'd also look in our imaging
25    system to see if there is any image of the

Page 124

1    returned mail.
2  Q.    All right.  I'm trying to picture what the
3    imaging system looks like when you're at a
4    terminal.  Is this in a form of a database with
5    links?
6  A.    Yes.
7  Q.    Would the imaging system for return mail include
8    an image of the returned item itself?
9  A.    Potentially, yes.
10  Q.    But as far as your knowledge of any return mail
11    in this instance relating to the Macholtzs' loan,
12    you haven't seen those documents?
13  A.    I don't recall seeing them.  There may have been
14    within the documents that I reviewed, but I don't
15    recall seeing them.
16        MR. WESTBROOK:  I may be done.  Let's
17    go off the record for just a minute.  I'll look
18    at my notes.
19        (Off the record.)
20        MR. WESTBROOK:  I don't have anything
21    further.
22        EXAMINATION
23  BY MS. LAPIN:
24  Q.    Mr. Dewhurst, I just have two quick questions.
25        You were asked about servicing transfer

Page 125

1    letters, and I just want to be clear, you're not
2    saying that Carrington didn't send servicing
3    transfer letters.  You're just, as we sit here
4    today, not aware of them being sent?
5  A.    Correct.
6  Q.    The same thing with the mortgage default letter.
7    You're not saying that a letter wasn't sent to
8    Mr. Macholtz prior to the foreclosure involving
9    -- informing him of the default under the
10    mortgage and the right to reinstate.  You're just
11    saying you don't recall those letters?
12  A.    That's also correct.
13  Q.    So if I represent that those letters exist, you
14    wouldn't dispute that they -- their existence?
15  A.    No, I wouldn't.
16  Q.    The other question I want to ask is counsel asked
17    you about research being done to respond to these
18    letters to determine if things were, I guess,
19    researched for confidentiality and proprietary
20    purposes and you said you didn't know if that had
21    been done.  I just want to be clear.  You just
22    don't have any personal knowledge of that.
23    You're not saying it wasn't done?
24  A.    That's also correct.
25  Q.    Just going one step further.  If people at

Page 126

1   Carrington are responding to requests for
2   information, would you agree they are going to
3   investigate and --
4              MR. WESTBROOK:  I'm going to object to
5   the form as leading.
6   BY MS. LAPIN:
7   Q.  They are going to research a file before they
8   respond to the letter, correct?
9   A.  The fact that the receiver issued a request for
10  information would cause them to research the file
11  and provide information that they are able to
12  provide.
13  Q.  And if they have -- if they deem something to be
14  confidential or proprietary, it's not unusual or
15  unwarranted for them to put that in the response,
16  correct?
17             MR. WESTBROOK:  Same objection.
18             THE WITNESS:  Correct.
19             MS. LAPIN:  All right.  I think that's
20  it.
21             MR. WESTBROOK:  I don't have anything
22  further.
23             COURT REPORTER:  Do you want to order
24  the transcript?
25             MR. WESTBROOK:  Yes.

Page 127

1              COURT REPORTER:  Do you want a hard
2   copy or just electronic?
3              MR. WESTBROOK:  Just electronic.
4              COURT REPORTER:  Deb, copy of the
5   transcript for you?
6              MS. LAPIN:  Yes, just as cheaply as
7   possible.
8              (Deposition concluded at 2:11 p.m.)
9                    -  -  -

Page 128

1
2        C E R T I F I C A T E   O F   N O T A R Y
3   STATE OF MICHIGAN )
                       )ss.
4   COUNTY OF OAKLAND )
5              I, Cindy A. Boedy, do hereby
6   certify that the preceding deposition was reported by
7   me, was recorded by me stenographically and later
8   reduced to typewritten form under my supervision, and
9   is a true and complete transcript.
10             I further certify that I am not
11  connected by blood or by marriage with any of the
12  parties, their attorney or agents; and that I am not
13  interested directly, indirectly, or financially in the
14  matter of controversy.
15             In witness whereof, I have hereunto
16  set my hand this day in Lake Orion, Michigan, County of
17  Oakland, State of Michigan.
18
19
20             Cindy A. Boedy, CSR 4696
21             Certified Stenographic Reporter
22             Oakland County, Michigan
23             My commission expires 10/4/26
24
25

Page 129

1   HEALTH INFORMATION PRIVACY & SECURITY: CAUTIONARY NOTICE
2   Litigation Services is committed to compliance with applicable federal
3   and state laws and regulations ("Privacy Laws") governing the
4   protection andsecurity of patient health information.Notice is
5   herebygiven to all parties that transcripts of depositions and legal
6   proceedings, and transcript exhibits, may contain patient health
7   information that is protected from unauthorized access, use and
8   disclosure by Privacy Laws. Litigation Services requires that access,
9   maintenance, use, and disclosure (including but not limited to
10  electronic database maintenance and access, storage, distribution/
11  dissemination and communication) of transcripts/exhibits containing
12  patient information be performed in compliance with Privacy Laws.
13  No transcript or exhibit containing protected patient health
14  information may be further disclosed except as permitted by Privacy
15  Laws. Litigation Services expects that all parties, parties'
16  attorneys, and their HIPAA Business Associates and Subcontractors will
17  make every reasonable effort to protect and secure patient health
18  information, and to comply with applicable Privacy Law mandates,
19  including but not limited to restrictions on access, storage, use, and
20  disclosure (sharing) of transcripts and transcript exhibits, and
21  applying "minimum necessary" standards where appropriate. It is
22  recommended that your office review its policies regarding sharing of
23  transcripts and exhibits - including access, storage, use, and
24  disclosure - for compliance with Privacy Laws.
25      © All Rights Reserved. Litigation Services (rev. 6/1/2019)